Evelyn M. POWELL, Plaintiff,

v.

WILMINGTON PLUMBING SUPPLY CO., INC., a Delaware Corporation; Wilmington Plumbing Supply Company, Inc. Amended Defined Benefit Pension Plan; Wilmington Supply Employee Health Plan; Wilmington Supply Dental Plan; and Mid–America Group, Inc., a Pennsylvania Corporation, Plan Administrator, Defendants.

Civil A. No. 92–501–JJF.

United States District Court,
D. Delaware.

March 30, 1996.

John M. Stull, David P. Cline, Wilmington, Delaware, for Plaintiff.

M. Duncan Grant, Andrew R. Rogoff, of Pepper Hamilton & Scheetz, Wilmington, Delaware, Michael J. Goodrick, and Richard L. Abbott, of Theisen, Lank, Mulford & Goldberg, Wilmington, Delaware, for defendants.

FARNAN, District Judge.

Plaintiff, Evelyn M. Powell ("Powell") was employed as a sales representative by Defendant Wilmington Plumbing Supply Co., Inc. ("Wilmington Supply") from April 1, 1974 until September 6, 1991. (D.I. 86 at pp. 1, 7). Wilmington Supply operates as a plumbing equipment supplier, and is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 2000 Maryland Avenue, Wilmington, Delaware. (D.I. 86 at p. 2). Defendant Wilmington Plumbing Supply Co., Inc., Amended Defined Benefit Pension Plan (the "Pension Plan") was at all times relevant hereto an employee pension benefit plan providing pension benefits to eligible employees of Wilmington Supply. (*Id.*) The Defendant Health and Dental Plans are employee welfare benefit plans providing medical and dental benefits to eligible Wilmington Supply employees. (*Id.*) Finally, Defendant Mid America Group, Inc. ("Mid America") is a corporation organized under the laws of Pennsylvania which provides actuarial services for qualified pension plans and which has offices in Philadelphia. (Id.).

This is an action asserting several claims under the Employee Retirement Income Security Act of 1974, 29 U.S.C. Sec. 1002 *et seq.* ("ERISA") and seeking recovery against Defendant Wilmington Supply for ERISA violations. Also sought are declaratory judgments as to Plaintiff's status as to Wilmington Supply's various pension, health and dental plans.

A bench trial[1] was held on this matter, and this Memorandum Opinion constitutes the Court's Findings of Fact and Conclusions of Law.

## A. MS. POWELL'S CLAIMS

Ms. Powell claims that Defendant Wilmington Supply wrongfully terminated her because she made inquiries concerning her benefits under the Pension Plan. (D.I. 86 at p. 4). Additionally, Ms. Powell alleges that Wilmington Supply failed to properly credit her pension account. Specifically, she alleges that the company wrongfully calculated her pension based on her 1988 salary rather than her higher 1990 salary and failed to include $100 weekly cash payments she received as part of her compensation. Ms. Powell also claims that after her termination Wilmington Supply failed to respond to her written requests for information on and documents of the Pension Plan in violation of ERISA § 502(c). (D.I. 86 at p. 3–4). Ms. Powell asks that the Court enter a declaratory judgment against the Pension Plan for the correct amount of benefits due to her and establish Ms. Powell's rights as to available options for payment. She also seeks damages against Wilmington Supply in the amount of $100 per day from October 23, 1991 to present for the company's failure to provide requested Pension Plan information and documents as required under 29 U.S.C. § 1132(c). (D.I. 1 at p. 6).

With respect to the health and dental plans, Ms. Powell claims that Wilmington Supply denied her COBRA healthcare continuation rights to notice and participation in the Health and Dental Plans within 14 days of her termination as set forth in 29 U.S.C. §§ 1166(a)(4) and 1132(c)(1) and ERISA § 606. (D.I. 86 at p. 3–4). Ms. Powell asks that the Court enter judgment on her behalf finding that she was wrongfully denied continuing health care coverage after her termination, and awarding her damages equal to the medical expenses she has incurred since her termination. Ms. Powell also seeks damages against Wilmington Supply in the

---

1. At the close of Plaintiff's evidence, the Court granted Motions For Judgment as a Matter of Law dismissing Plaintiff's claims against Defendants Alexander Drucker, Daniel Hart and Mid America Group, Inc.. (D.I. 121, Tr.Trans. at p. 33).

amount of $100 per day from the date of termination to present for the company's failure to provide her with notice of her COBRA rights as required by 29 U.S.C. § 1132(c)(1). (D.I. 1 at p. 8).

## B. WILMINGTON SUPPLY'S RESPONSE

Wilmington Supply responds that Ms. Powell was terminated due to her poor sales performance, the change in market conditions relating to the line of product which she was responsible for, and her inability to adjust her work performance to meet changing standards of the industry in general and the business in particular. (D.I. 125 at p. 3). Additionally, Wilmington Supply responds that Ms. Powell's pension benefit was properly calculated because the Third Amendment to the Pension Plan properly froze benefits at 1988 levels and the $100 per week cash payments were expense reimbursement payments properly excluded from her compensation. (D.I. 125 at pp. 19, 22). Further, the company argues that Ms. Powell admits that her September 23, 1991 written request for Pension Plan information was responded to by Wilmington Supply but has offered no evidence that the response time exceeded the 30 day statutory period. (D.I. 125 at p. 18–19). Wilmington Supply also asserts that pursuant to 29 U.S.C. § 1161(b) only companies employing twenty workers are required to provide continuation health and dental coverage under COBRA, and Ms. Powell has not proven that Wilmington Supply employed twenty workers during the year preceding her termination. (D.I. 125 at p. 9).

Finally, Wilmington Supply has asserted a cross-claim demanding contribution and/or indemnification from Mid America. (D.I. 86 at p. 6). Mid America's response to the cross-claim asserts that the company was not the Pension Plan Administrator, but only provided the Pension Plan with actuarial and plan record keeping services. Further, Mid America states that the company calculated Ms. Powell's pension benefits based upon compensation figures provided by Wilmington Supply. (D.I. 128 at p. 2). Lastly, Mid America asserts that all services provided were performed in accordance with the Pension Plan provisions and applicable federal law. (*Id.*).

## I. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. MS. POWELL'S TERMINATION FROM WILMINGTON SUPPLY

■ Ms. Powell was hired by Alexander Drucker, owner and President of Wilmington Supply, on April 1, 1974 as an outside salesperson for refrigeration products. (Tr. Trans. at A60). Ms. Powell was a satisfactory employee during her eighteen years with Wilmington Supply. (Powell Video). Ms. Powell was never insubordinate or a behavior problem while with the company. (*Id.*).

In the Spring of 1991 Ms. Powell asked both Scott Foster, Wilmington Supply's Chief Financial Officer, and Daniel Hart, Vice President of Sales, about her benefits under the Pension Plan. (D.I. 122 at p. 34); (Powell Video). These inquiries appeared to create a hostile environment for her as both men began to treat her more coldly. (*Id.*). For example, after making the Pension Plan inquiries she approached Mr. Hart to ask for a new gasoline credit card, a fairly common incident as salespersons' credit cards occasionally ran out. Mr. Hart questioned why she needed the new card and told her that she would have to wait for a replacement. (Powell Video). Shortly thereafter, without being given a reason for the decision, she was terminated by Mr. Hart. (D.I. 122 at p. 33); (Powell Video). The Court recognizes that a parallel explanation for Ms. Powell's treatment is possible as these incidents occurred at a time when new management was attempting to restructure the company to meet significant financial problems. (Tr. Trans. at A87). For instance, on cross-examination, Ms. Powell acknowledged that during the spring of 1991 Wilmington Supply laid off numerous employees. (Powell Video). She further acknowledged that on September 6, 1991, the day that she was terminated, at least one other employee was also let go from the company. (*Id.*).

Mr. Hart testified that while other companies were making technological advancements, for example, shifting away from the

use of Freon to other refrigerants, due to a lack of economic resources Wilmington Supply was unable to adapt to the changing market. (Tr.Trans. at B11). As a result of these factors the company's market share in the Northeast corridor rapidly diminished and their profits fell. (*Id.*).

During this difficult economic period, Ms. Powell's sales and profit margins also declined. (Tr.Trans. at B12). Ms. Powell sold only one product, refrigerant, and had only a handful of unprofitable customers. (*Id.*). In an effort to increase Ms. Powell's sales and profitability, Mr. Hart accompanied her on some of her sales calls. (*Id.*). He also spent time discussing with Ms. Powell her inventory, customer base, past sales methodologies and future sales plan. (*Id.*). In sum, Mr. Hart attempted to help Ms. Powell expand her product lines by moving to more modern split system refrigeration units, into the HVAC aspect of the market and possibly into larger boiler sales. (Tr.Trans. at B11–12, B18). However, these attempts were unsuccessful because Ms. Powell had a lack of knowledge of these modern systems, was more comfortable with the antiquated lines she had been selling for several years and was reluctant to attempt the change.

Mr. Drucker, Mr. Foster and Mr. Hart acknowledged that Wilmington Supply did not have a standard evaluation process for its employees. (Tr.Trans. at A72–73, A97–98, B19). Additionally, Mr. Foster admitted that Wilmington Supply hired new salespeople after Ms. Powell was terminated, but stated that none of these new employees were hired into the refrigeration department. (Tr. Trans. at A96).

Based on the evidence presented, the Court concludes that Wilmington Supply's decision to terminate the employment of Ms. Powell was based on legitimate business reasons and was not a retaliatory action. The Court finds the decision was the result of the economic recession experienced in the building industry, Wilmington Supply's inability to keep up with the technological advances of its competitors and Ms. Powell's declining profitability and inability to learn new products. Furthermore, the Court finds that Ms. Powell's termination was not an isolated ac-

tion, but was part of a company wide cost-cutting campaign that included numerous lay offs.

## B. MS. POWELL'S PENSION PLAN BENEFIT

At the time of her termination, Ms. Powell was a participant in the Pension Plan. (D.I. 86 at p. 7). The Pension Plan was "non-contributory," meaning it was funded entirely by Wilmington Supply with no expense to the employee. (Tr.Trans. at A79); (Ex. M–2 at p. 5). The Pension Plan was designed so that as an employee's salary and years of service increased so too did the employee's pension benefit. (Ex. M–2 at p. 5). Originally, under the Pension Plan an employee's monthly retirement benefit was equal to "one-twelfth ($\frac{1}{12}$) of one and twenty-five one-hundredths percent (1.25%) of his or her average Basic Annual Salary times [his or her] total number of years of Service with [Wilmington Supply] at [his or her] Normal Retirement Date less ninety-three and six-tenths percent (93.6%) of the Primary Social Security Benefit ...". (*Id.*). An employee's Average Basic Annual Compensation "is the average of the highest five (5) consecutive years salary paid during [his or her] plan participation." (*Id.*).

## I. THE $100 PER WEEK CASH PAYMENTS

 Ms. Powell received weekly cash payments of $100 for approximately the last four years of her employment. (D.I. 122 at p. 30); (Powell Video). In addition to Ms. Powell, several other employees at Wilmington Supply also received cash payments. (Powell Video).

Mr. Drucker testified that Ms. Powell was the only employee who received weekly cash payments and that she received the payments because she was an outside salesperson who did not have a company car. (Tr. Trans. at A75.). Explaining the purpose of the weekly cash payments, Mr. Drucker testified:

When Ms. Powell first applied for the position, she would need a vehicle to call on customers outside the premises of the company. She told me she required a more

expensive car than we had in our budget. To help her in this situation, we came to an agreement to contribute a certain amount of money each week for the payment of the car, which was mutually agreed upon. (Tr. Trans. at A60).

Mr. Drucker further testified that the payments began when Ms. Powell first joined the company, always stayed at $100 per week and were for the limited purpose of purchasing her car. (Tr.Trans. at A62, A74). Mr. Foster subsequently testified that as part of his cost-cutting measures he terminated the cash payments in 1991. (Tr.Trans. at A92).

In response, Ms. Powell testified that she had personal knowledge that employees Debbie Allen and Mel Levy also received weekly cash payments. (Powell Video). Ms. Powell also offered the testimony of Mrs. Shirley Morlock to further rebut Mr. Drucker's contention. Mrs. Morlock was not an outside salesperson who incurred weekly traveling expenses, but rather worked in the Wilmington Supply Accounts Payable Department. (Tr.Trans. at B27). Mrs. Morlock received a weekly cash payment of $50. (Id.). Apparently, Ms. Morlock approached Mr. Drucker about a raise and every Friday thereafter found $50 in cash in her desk drawer. (Tr. Trans. at B35–36). Additionally, Mrs. Morlock knew of at least a dozen other employees who received cash payments. She referred to the payments as being made "under the table." (Tr.Trans. at B37–38).

Ms. Powell also contradicted Mr. Drucker's testimony that the weekly payments were expense reimbursements. Ms. Powell testified that she was provided with a company gasoline credit card to pay her gasoline expenses. (Powell Video). She also testified that she submitted expense vouchers for items such as business lunches, and was reimbursed by the petty cash office. (Powell Video). Mr. Drucker's testimony acknowledged that both company credit cards and expense vouchers were used to either pay for or reimburse business expenses. (Tr.Trans. at A61).

Based on the evidence presented, the Court concludes that Mr. Drucker, the owner and President of Wilmington Supply, compensated employees, including Ms. Powell, by payment of non-reported, non-taxed, "under-the-table" weekly cash payments. Specifically, the Court finds that Mr. Drucker's testimony concerning the purpose of the weekly cash payments to Ms. Powell and others is untruthful. Therefore, the Court concludes the $100 weekly payments made to Ms. Powell by Mr. Drucker were income and must be credited as compensation to her in any benefit calculation.

## II. THE THIRD AMENDMENT TO THE PENSION PLAN

■ On September 14, 1992, Wilmington Supply adopted the Third Amendment to the Pension Plan. (Plt.Ex. 27); (Dft.Ex. 1); (Ex. M–1). Under the Third Amendment, each Pension Plan participant's accrued retirement benefits were frozen at their December 31, 1988 levels. (Id.). Specifically, the Third Amendment stated:

> Section 5.1(a). Each Participant shall be entitled to receive a monthly retirement benefit at his Normal Retirement Date and thereafter payable for life, as an amount equal to one-twelfth ($\frac{1}{12}$) of the Participant's Accrued Benefit hereunder as of December 31, 1988.

> . . . . . . . . . . . . . . .

> Section 5.3. As of his Normal Retirement Date or any date prior thereto, a Participant's Accrued Benefit, payable at his Normal Retirement Date, shall be equal to his Accrued Benefit as of December 31, 1988.

(Id.).

Ms. Powell argues that the Third Amendment illegally eliminated benefit accruals for which she was already vested. (D.I. 122 at p. 24). Specifically, Ms. Powell argues, that because the Third Amendment improperly froze benefit accruals at 1988 levels her years of service with Wilmington Supply were reduced from eighteen to sixteen. Additionally, she argues that the Third Amendment improperly excluded her two highest salary years, 1989 and 1990, from her benefit calculation. Consequently, she argues that the retirement benefit she received was too low.

Ms. Powell testified that in June of 1991, she began asking about her pension benefits.

She testified that Mr. Foster gave her the phone number for Carol Bowles, an employee of Mid America. Ms. Powell testified that Ms. Bowles advised her that her expected retirement benefit was $27,080 as calculated on her Summary of Benefits Statement as of December 31, 1990. (Powell Video); (Plt.Ex. 44). After her termination, however, Ms. Powell received a lump sum retirement benefit payment of $22,568 rather than the $27,080 Ms. Bowles had stated. (Powell Video); (D.I. 86 at p. 11).

As mentioned, Mid America prepared annual statements for the individual Pension Plan participants, detailing the participant's expected retirement benefit. Ms. Powell received these annual benefit statements for the years 1983 through 1991. These summaries stated that Ms. Powell's expected retirement benefits were as follows:

| YEAR | SALARY | LUMP SUM PAYMENT |
| --- | --- | --- |
| 1983 | $18,100 | $ 8,023 |
| 1983 [2] | $18,100 | $ 6,934 |
| 1984 | $18,900 | $ 8,567 |
| 1985 | $20,600 | $10,948 |
| 1986 | $20,000 | $12,767 |
| 1987 | $20,600 | $15,669 |
| 1988 | $19,300 | $22,568 |
| 1989 | $23,495 | $21,688 |
| 1990 | $26,260 | $27,080 |
| 1991 | $17,100 [3] | $22,568 |

The 1991 figure was arrived at by using an Average Basic Annual Compensation figure of $19,880 derived from Ms. Powell's salaries from 1984–1988. (Bowles Ex. 1). Additionally, Ms. Powell was credited with 15 years of service based on her start date of 1973 and the Third Amendment freeze date of 1988. (*Id.*). Ms. Powell argues that the parties stipulated that she worked at Wilmington Supply for eighteen years. Additionally, she testified and offered W–2 Tax Return Forms that show her 1989 salary was $23,495 and her 1990 salary was $26,260. (D.I. 122 at p. 26). Consequently, Ms. Powell argues that if her 1989 and 1990 salaries and two additional years of service had been included in the calculation she would have received a larger benefit. (D.I. 122 at p. 26).

Congress' chief purpose in enacting ERISA was to ensure that workers receive promised pension benefits upon their retirement. *Dade v. North American Philips Corp.*, 68 F.3d 1558 (3d Cir.1995); 29 U.S.C. § 1001 *et seq.* Therefore, ERISA provides that "the accrued benefit of a participant under a plan may not be decreased by an amendment to the plan ..." 29 U.S.C. § 1054(g)(1).

The Third Amendment to the Pension Plan was passed by the Officers of Wilmington Supply on September 14, 1992 with a retroactive effective date of January 1, 1989. By employing the retroactive effective date, the Third Amendment attempted to retroactively freeze pension benefits at 1988 levels. (Ex. M–1). Therefore, the issue before the Court is whether the Third Amendment reduced Ms. Powell's previously accrued Pension Plan benefits.[4]

■ The accrual of benefits in a defined benefit plan focuses on when the participant became eligible and when the plan is funded. *Izzarelli v. Rexene Products Co.*, 24 F.3d 1506, 1515 (5th Cir.1994). That Ms. Powell was an eligible participant under the Plan is not disputed. Additionally, the terms of the Plan provide that Wilmington Supply's contributions to the Plan on behalf of each participating employee were to be made annually. (Ex. M–1, The Pension Plan Sec. 4.1). Mr. Drucker testified that Wilmington Supply did make annual contributions to the Pension Plan. (Tr.Trans. at A63). Further evidence that Ms. Powell's benefits accrued

---

**2.** Ms. Powell received two summary statements in 1983. Although no explanation was provided, based on the other summaries, the Court finds that this is the accurate estimate.

**3.** Ms. Powell's 1991 salary was lower because she was terminated September 6, 1991, and therefore, received no salary compensation for the final four months of the year.

**4.** The parties have cited *Schoonejongen et al. v. Curtiss–Wright Corp.*, 18 F.3d 1034 (3d Cir.1993), rev'd *Curtiss–Wright Corp. v. Schoonejongen et al.*, —— U.S. ——, 115 S.Ct 1223, 131 L.Ed.2d 94 (1995). The issue in Schoonejongen was whether the employer had provided procedures for amending its welfare plan and subsequently followed those procedures. The case involved welfare rather than pension benefits and did not address the validity of retroactive benefit reductions. Therefore, the Court concludes that *Schoonejongen* is not relevant to the instant action.

annually is found in the benefit summary statements she received each year. For example, the 1990 Summary of Benefits Statement provided to Ms. Powell by Wilmington Supply stated that her "ACCRUED BENEFITS AS OF 12/31/90" were $27,080. (Plt.Ex. 44); (Ex. M–12). Therefore, the Court concludes that because Ms. Powell was a vested participant, her retirement benefits accrued at the time Wilmington Supply made its annual contribution to her plan.

By application of the Third Amendment to Ms. Powell's accrued benefits, Wilmington Supply retroactively froze her benefits at 1988 levels. As a result, for purposes of her Pension Plan benefit, Ms. Powell's years of service were reduced from eighteen to fifteen and her 1989 and 1990 salaries were discounted. These calculation changes effectively stripped Ms. Powell of the benefits she had accrued in 1989 and 1990. Thus, the Court concludes that the Third Amendment improperly decreased the accrued retirement benefits of Ms. Powell in violation of 29 U.S.C. § 1054(g)(1).

### III. MS. POWELL'S CORRECT PENSION PLAN BENEFIT

For the above reasons, the Court concludes that Ms. Powell's benefit calculation should have credited Ms. Powell with eighteen years of service and included her 1989 and 1990 salaries. Additionally, as the Court previously found that the $100 weekly cash payments Ms. Powell received were also compensation, these funds should have been added to Ms. Powell' salary figures. Therefore, Ms. Powell's benefit should have been calculated using the following salary figures:

| YEAR | SALARY | CASH PAYMENTS | TOTAL |
|------|--------|---------------|-------|
| 1986 | $20,000 | $5,200 | $25,200 |
| 1987 | $20,600 | $5,200 | $25,800 |
| 1988 | $19,300 | $5,200 | $24,500 |
| 1989 | $23,495 | $5,200 | $28,695 |
| 1990 | $26,260 | $5,200 | $31,460 |

**AVERAGE SALARY 1986–1990: $27,131**

As a result, Ms. Powell's Pension Plan benefit should have been calculated using an Average Basic Annual Compensation figure of $27,131 and eighteen years of company service.

### C. THE MID AMERICA ISSUE

Although no written contract existed, Wilmington Supply hired Mid America to manage the plan. (Tr.Trans. at A62). Mid America is a Pennsylvania corporation that provides actuarial services for qualified pension plans. As part of the services it performed for Wilmington Supply, Mid America prepared annual statements for the individual Pension Plan participants, calculated individual benefits based upon compensation figures supplied by Wilmington Supply and, based on the compensation figures supplied by Wilmington Supply, determined the amount of employer contribution needed to fund the plan. (D.I. 86 at p. 10); (Tr.Trans. at A62–3). Nowhere in the Pension Plan documentation was Mid America identified as the Plan Administrator. However, The Pension Plan's Summary Plan Description did identify Wilmington Supply as the Plan Administrator. (D.I. 86 at p. 11). Therefore, the Court concludes that Mid America was not the Plan Administrator, but rather an actuarial company that performed pension calculations based on figures provided by Wilmington Supply. Because there is no evidence that Mid America knew of the "under the table" weekly payments, the Court concludes that Mid America is not liable to Wilmington Supply for any error in its calculations.

### D. MS. POWELL'S REQUEST FOR PENSION PLAN DOCUMENTATION

Ms. Powell contends that Wilmington Supply failed to timely provide Pension Plan documents, information and calculations of benefits requested by her in writing. (D.I. 122 at p. 10). The parties stipulated to the following facts concerning Ms. Powell's written requests for Pension Plan information and Wilmington Supply's responses:

1. After her termination, Ms. Powell's first written inquiry to Wilmington Supply concerning her pension benefits was a September 23, 1991 letter mailed to Mr. Foster. (D.I. 86 at p. 7).

2. Sometime after September 23, 1991, but before December 27, 1991, Ms. Powell received a packet of information from Wil-

mington Supply concerning the Pension Plan. (D.I. 86 at p. 8).

3. The packet included "Benefit Information Report Prepared For Evelyn Powell" and documents discussing the various methods of distribution and dates of distribution of her pension benefits. (*Id.*).

4. Also between September 23, 1991, and December 27, 1991, Ms. Powell received an application for Pension benefits from Wilmington Supply. (*Id.*).

5. On May 4, 1992 Counsel for Ms. Powell wrote to Wilmington Supply requesting copies of the Pension Plan language Document, a Summary Plan Description, the most recent Form 5500 annual report, and a 1991 calculation of Plaintiff's pension benefits. (*Id.* at p. 9).

6. On May 29, 1992 Mr. Foster sent to Ms. Powell copies of a Notice of Intention to Terminate the Pension Plan, a Summary Plan Description and benefit application forms. (*Id.*).

7. In December of 1992, with the assistance of legal counsel, Ms. Powell applied for her pension benefits. (Id. at p. 8). Within two weeks of her application, Ms. Powell received a lump sum benefit payment of $22,568. (*Id.*).

Upon the written request of a pension plan participant, the plan administrator, within thirty (30) days, must furnish a copy of the latest updated summary plan description, plan description, and the latest annual report. 29 U.S.C. §§ 1024(b)(4), 1132(c)(1). Any administrator who fails or refuses to comply with this requirement may in the court's discretion be liable to such participant in the amount of $100 a day from the date of such failure. 29 U.S.C. § 1132(c)(1).

As stated above, the parties stipulated that Ms. Powell's first written inquiry to Wilmington Supply concerning her pension benefits was a September 23, 1991 letter that was responded to sometime before December 27, 1991. Ms. Powell has not produced any further evidence that Mr. Foster's response letter was received more than thirty (30) days after her request was made. Additionally, on cross-examination, Ms. Powell admitted that the September 23, 1991 letter did not ask for a copy of the Pension Plan's latest

updated summary plan description, plan description, or annual report. (Powell Video). Further, a careful reading of the letter establishes that Ms. Powell only sought information regarding the amount of her retirement benefit and not information concerning the Pension Plan.

Similarly, the parties agree that on May 4, 1992, Ms. Powell's counsel mailed a letter to Wilmington Supply requesting a copy of the Plan Language Document, the most recent 5500 annual report, a Summary Plan Description and a benefit calculation pertaining to Ms. Powell's account and that Wilmington Supply's May 27, 1992 response provided a Summary Plan Description, Defined Benefit Pension Plan Document, including a benefit information sheet and election form, and a 1991 annual statement. (D.I. 86 at p. 9).

Based on this evidence presented, the Court finds that Ms. Powell's September 23, 1991 letter requested information regarding her retirement benefit. Additionally, the Court finds that Wilmington Supply timely responded and provided the information requested. The Court also finds that Wilmington Supply timely and fully responded to the May 4, 1992 letter requesting detailed Pension Plan documentation. Therefore, the Court concludes that Wilmington Supply did not violate the terms of 29 U.S.C. §§ 1024(b)(4) or 1132(c)(1).

### E. COBRA CONTINUATION NOTICE

■ At the time of her termination, Ms. Powell was a participant in the Wilmington Supply Health and Dental Plans. (D.I. 86 at p. 7). Ms. Powell testified that upon her termination Wilmington Supply did not inform her of her rights to COBRA continuation of her medical and dental plan coverage. (Powell Video); (D.I. 122 at p. 2). Ms. Powell testified that on December 27, 1991 she sent a letter to Wilmington Supply requesting continued health and dental coverage. (*Id.*); (Plt.Ex. 7). Ms. Powell further testified that she received a response letter from Mr. Foster dated December 30, 1991 stating "[i]f you wish continued coverage, you must forward a check to cover the premiums for

October through January ($824.48)." [5] Ms. Powell also testified that she did not have enough money to pay $824, but could afford to make monthly payments of $216. (Powell Video). Additionally, Ms. Powell's counsel sent several letters to Wilmington Supply informing the company that she wished to reinstate her coverage on a "going forward" basis, meaning without having to back pay for previous months for which she was not covered. (Plt.Ex. 14); (Plt.Ex. 18). Wilmington Supply's response to these letters informed Ms. Powell that she could either begin coverage retroactive to her termination date by backpaying the costs or could start new coverage which would not cover existing conditions. (Plt.Ex. 15); (Plt.Ex. 16); (Plt.Ex. 20).

On cross-examination Ms. Powell admitted that in January 1992, she obtained employment with Commercial Refrigeration Supply Company ("Commercial Supply"). (Powell Video). She also admitted that while she could not obtain health and dental insurance on Commercial Supply's health plan, the company did reimburse her for the cost of obtaining her own insurance. (*Id.*).

Within fourteen days of termination of employment an employer must offer its former employee COBRA continuation health insurance. 29 U.S.C. §§ 1132(c)(1), 1166(c). This notification requirement only applies to companies which employ at least twenty people on a typical business day during the preceding calendar year. 29 U.S.C. § 1161(b). Any employer failing to timely provide COBRA notice to former employees is subject to damages of up to $100 per day. 29 U.S.C. § 1132(c)(1).

Wilmington Supply argues that Ms. Powell has failed to prove that the company employed twenty people prior to her termination. (D.I. 125 at p. 9). Ms. Powell, however, cites to Schedule B of Form 5500 for the period January 1, through December 31, 1990 as evidence that Wilmington Supply employed thirty-two (32) workers in 1991, the year preceding her termination. (Plt.Ex. 41). On this evidence, the Court finds that Wilmington Supply employed thirty-two workers in 1990. Therefore, the Court concludes that Wilmington Supply was required to notify Ms. Powell of her COBRA rights by September 20, 1991, fourteen days after her termination.

■ Wilmington Supply admits that notice was not given until Mr. Foster's December 30, 1991 letter was sent to Ms. Powell. Therefore, the Court concludes Wilmington Supply is exposed to a damages claim of up to $100 per day from September 20, 1991 until December 30, 1991, a period of 101 days. In determining the appropriate amount to be awarded, the Court, however, finds that Ms. Powell was not harmed by the delay because she was able to secure insurance in January 1992. Additionally, Ms. Powell did not prove that she incurred any uncompensated medical expenses during the interim period. However, because Wilmington Supply did technically violate the COBRA notice requirement, the Court will award Ms. Powell damages of $20 per day. Accordingly, the Court finds that Ms. Powell is entitled to $2020.00 in damages for Wilmington Supply's failure to provide timely notification of her COBRA rights.

## II. CONCLUSION

The Court concludes that Ms. Powell has established that she is entitled to a recalculation of her pension plan benefits and COBRA damages in the amount of $2020.00.

The Court will enter an Order requesting the parties to submit a Proposed Final Order in accordance with the conclusions of this Memorandum Opinion.

---

5. The monthly cost of coverage was $190.43 for health and $15.69 for dental. (Px No. 9). There-fore, the total monthly cost for coverage was $216.12.