Bijan DANESHVAR, Plaintiff,

v.

GRAPHIC TECHNOLOGY, INC., Defendant.

No. 97–2304–JWL.

United States District Court, D. Kansas.

Dec. 23, 1998.

Lisa White Hardwick, Larry M. Schumaker, Shook, Hardy & Bacon L.L.P., Kansas City, MO, Melissa A. Taylor, Shook, Hardy & Bacon L.L.P., Overland Park, KS, for Bijan Daneshvar, plaintiff.

Joyce R. Rosenberg, Spencer, Fane, Britt & Browne, Kansas City, MO, Jonathan F. Duncan, Blackwell Sanders Peper Martin, LLP, Kansas City, MO, Mark P. Johnson, Rowdy B. Meeks, Sonnenschein, Nath & Rosenthal, Kansas City, MO, for Graphic Technology Inc, defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

In this action, plaintiff Bijan Daneshvar claims that defendant Graphic Technology, Inc. failed to promote him on the basis of his race and national origin and terminated his employment in retaliation for engaging in protected activity, all in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, and the Kansas Act Against Discrimination (KAAD), K.S.A. § 44–1001 et seq.[1] Plaintiff also claims that defendant violated the notification provisions of the Consolidated Omnibus Budget Reconciliation Act (COBRA), 29 U.S.C. § 1161 et seq. Plaintiff seeks backpay, compensatory and punitive damages and reinstatement.

A trial to the court was held in this matter from November 17, 1998 through November 19, 1998. The court has thoroughly considered the evidence and arguments presented at trial. It has relied to a considerable degree on its opportunity to form conclusions about the credibility of the witnesses from close observation of their demeanor while testifying at trial. The court is now prepared to issue its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons set forth fully below, judgment is entered in favor of defendant on plaintiff's discriminatory failure-to-promote claims. With respect to plaintiff's retaliatory discharge claim and COBRA claim, however, the court finds in favor of plaintiff and awards plaintiff the relief described below.

## I. Findings of Fact

Plaintiff Bijan Daneshvar is a United States citizen of Iranian descent and national origin. In 1988, plaintiff began his employment with defendant Graphic Technology, Inc. as an assistant press operator in the rotary department. In its rotary department, defendant produces bar code labels for shipping companies such as Federal Express and United Parcel Service and prescription labels for pharmacies. Plaintiff began his employment on the night shift, but moved to the day shift as soon as he became eligible (after one year of employment). He remained in the assistant press operator position for the duration of his employment with defendant.

*Maintenance Mechanic Position*

On July 11, 1995, defendant posted an opening for a maintenance mechanic position. A maintenance mechanic is primarily responsible for repairing and maintaining production equipment. Plaintiff submitted an application for the position to defendant's human resources department and was interviewed by a woman in the human resources department.[2] According to Greg Lueck, defendant's maintenance supervisor at the time the mechanic position was posted, all interviews for the position were conducted by the human resources department. Plaintiff was informed by the woman in human resources that his inability to weld precluded him from further consideration for the position. Plaintiff concedes that he cannot weld, although he expressed a willingness to learn the skill

---

1. Because § 1981 does not protect individuals from discrimination based on national origin, *see Aramburu v. Boeing Co.*, 112 F.3d 1398, 1411 n. 10 (10th Cir.1997), plaintiff's § 1981 claims are based solely on race.

2. Plaintiff does not recall the woman's name.

during a 90–day training period described in the job posting. Pat Flaherty, defendant's Operations Manager for the Rotary Department at the time, later informed plaintiff that he did not receive the position because plaintiff could not weld and because defendant needed someone with continuous experience in maintenance.

According to Mr. Lueck, welding is a required skill for the maintenance mechanic position. Moreover, Mr. Lueck testified that if he had to choose between a candidate with welding experience and a candidate without welding experience, he would select the candidate with welding experience. In fact, Mr. Lueck testified that, to his knowledge, defendant had never hired anyone for the position who did not possess welding experience. An external candidate, Max Hankins, was selected for the maintenance mechanic position. Mr. Hankins had welding experience and was required to weld periodically on the job. Mr. Lueck estimated that a maintenance mechanic spends about five to ten percent of his or her working time welding.

*Tool Room Technician Position*

On July 15, 1996, defendant posted an opening for the first-shift tool room technician position. The tool room technician is primarily responsible for preparing all rotary jobs before the jobs go to the press floor. The tool room technician, for example, mounts printing plates for press runs and issues dye tracking for specific printing jobs. Defendant schedules only one tool room technician to work on each shift and, accordingly, the tool room technician must be able to work independently and with little supervision. In fact, the lead man in the tool room, Eric Hansen, supervises the tool room technician less than twenty-five percent of the time the technician works. Moreover, the tool room technician spends a great deal of time communicating with rotary employees as well as outside vendors.

Six individuals applied for the tool room technician position: Plaintiff; Bart Goodwin; Carlene Johnson; Chris Oots; Lanny Turner; and Jeff Werth. A three-member panel interviewed all applicants for the position except for Mr. Turner, who was not eligible for an interview due to recent disciplinary action. The interview team consisted of Eric Hansen, the lead man in the tool room; D.J. Lynch, the second-shift tool room technician; and Troy Lucas, the first-shift tool room technician whose pending departure created the vacancy for which the six individuals had applied.

After each interview, the panel discussed the applicant's qualifications. Consistent with normal procedures, the panel did not review the personnel files or performance evaluations of the applicants. The panel members did, however, consider their own prior working experience with the applicant in analyzing his or her qualifications for the position.

Eric Hansen had contact with plaintiff on a daily basis and actually worked with plaintiff on several occasions. Mr. Hansen worked with plaintiff in the tool room on three or four occasions over a two- to three-year period. He also worked with plaintiff on a press. Based on these experiences, Mr. Hansen concluded that plaintiff lacked initiative and required a high degree of supervision. Mr. Hansen would often have to give plaintiff explicit instructions and, on many occasions, would have to repeat those instructions. Mr. Hansen verified his conclusions by visiting with several press operators about plaintiff's initiative, including Mike Franklin, Len Cornelius, Dale Patton and Paul Nickel. In addition, Mr. Hansen believed that plaintiff possessed poor verbal communication skills—that plaintiff was difficult to understand and his grasp of the English language was not strong.

The panel recommended Bart Goodwin for the position based on the panel members' experiences with Mr. Goodwin and discussions with press operators and Mr. Goodwin's team leader. Specifically, the panel concluded that Mr. Goodwin possessed good verbal communication skills and would require minimal supervision.

Mr. Hansen testified that he believed Mr. Goodwin was "eager to learn" and "highly motivated." Bob Armor, defendant's production manager at the time, accepted the recommendation of the panel. Mr. Goodwin is still employed as the tool room technician.

Mr. Hansen concedes that, on six or seven occasions, he made comments to plaintiff about the Middle East during the Gulf War such as referring to Saddam Hussein as plaintiff's "uncle." Mr. Hansen believed that he and plaintiff were joking and testified that sometimes plaintiff would initiate such banter by asking Mr. Hansen, "How's your buddy in the desert?" Plaintiff testified that such comments made him uncomfortable, that he expressly told Mr. Hansen that he was not from that country, but that Mr. Hansen replied, "All of you are the same because you're from the Middle East." Mr. Hansen denies making this statement.

In October 1996, plaintiff filed a charge of discrimination with the Kansas Human Rights Commission alleging national origin discrimination based on defendant's failure to promote plaintiff to· several positions. Plaintiff received his notice of right to sue and, in June 1997, filed this lawsuit.

*Events Leading to Plaintiff's Discharge*

On July 28, 1997, Jarrod Johnson reported to his supervisor, Bob Armor, that plaintiff was bothering him. Mr. Armor referred Mr. Johnson to Jennifer Van Wagoner, defendant's human resources manager. Mr. Johnson informed Ms. Van Wagoner that he was seated in the lunchroom a few days earlier when plaintiff came up behind him, "stooping down like he was going to do something to [him]" and then ran off laughing when Mr. Johnson saw him. Apparently, plaintiff repeated this three or four times during a five-minute period. Ms. Van Wagoner's notes from her discussion with Mr. Johnson do not reflect that plaintiff ever touched Mr. Johnson. Another employee who witnessed the incident, however, was interviewed in connection with Mr. Johnson's complaint and reported that plaintiff

"kept hitting [Mr. Johnson] on the shoulder . . . and poking him in the ribs with his fingers." Defendant did not discuss Mr. Johnson's complaints with plaintiff at any time prior to his discharge.

On July 30, 1997, Marci Randel reported to her supervisor, Pat Flaherty, that plaintiff had recently called her over to his press and asked her how she liked her chicken cooked and what kind of wine she liked. When Ms. Randel asked plaintiff why he was asking these questions, he replied that he was going to cook dinner for Ms. Randel. According to Ms. Randel, she wanted plaintiff to know that she was married, so she responded that it was nice of plaintiff to ask her and her husband to dinner. Plaintiff replied, "No. I don't think you like it that way." Ms. Randel believed that plaintiff was suggesting more than dinner. According to Ms. Randel, she did not want Mr. Flaherty to take any action with respect to plaintiff. She simply wanted him to be on notice of the situation in case it escalated. Mr. Flaherty referred Ms. Randel to Jennifer Van Wagoner. Ms. Randel shared the incident with Ms. Van Wagoner, who documented the complaint and simply noted "I explained to Marci that she should directly tell [plaintiff] that he should not talk to her in that manner and not to continue the discussion." Defendant did not discuss Ms. Randel's allegations with plaintiff at any time prior to his discharge.

At some point between Wednesday, July 30, 1997 and Sunday, August 3, 1997, Ms. Van Wagoner informed Christine Slavski, a human resources employee, that plaintiff was going to be terminated on Monday, August 4, 1997 and instructed Ms. Slavski to prepare plaintiff's COBRA paperwork for the discharge meeting. Ms. Slavski completed the relevant COBRA documents on Sunday, August 3, 1997.

On Monday, August 4, 1997, Mr. Armor received a voice mail message from Ms. Van Wagoner instructing him to terminate plaintiff's employment. According to Mr. Armor, he felt "uncomfortable" discharg-

ing plaintiff and questioned whether plaintiff could be discharged based solely on the incidents with Ms. Randel and Mr. Johnson. In light of his concerns, he spoke with Ms. Van Wagoner, who apparently advised him to go ahead with the termination of plaintiff's employment. Mr. Armor then contacted Pat Flaherty about the termination decision. After asking Mr. Armor whether the decision had been reviewed and authorized by human resources, Mr. Flaherty told Mr. Armor to proceed with the discharge meeting. Accordingly, Mr. Armor met with plaintiff on August 4, 1997 and informed him that defendant had decided to terminate his employment based on complaints from two employees about plaintiff's allegedly harassing behavior. Mr. Armor did not identify the employees who had made the complaints or explain to plaintiff the nature of the complaints.

Curiously, Ms. Van Wagoner denies making the decision to terminate plaintiff's employment and has no memory of leaving a voice mail message for Mr. Armor. Moreover, Ms. Van Wagoner testified that she did not know who made the decision to terminate plaintiff's employment. In fact, during her testimony, Ms. Van Wagoner clearly attempted to distance herself as much as possible from the circumstances surrounding plaintiff's employment and, rather incredibly, had great difficulty remembering anything about plaintiff's employment or his termination.[3]

She did, however, remember that plaintiff had filed "a number of different" complaints about defendant over the course of his employment.[4] Specifically, she remembered receiving a copy of the charge of discrimination that plaintiff had filed with the Kansas Human Rights Commission in 1996 and "may have" known that the charge had been dismissed in March 1997 and that plaintiff had a right to file a lawsuit at that time. According to Ms. Van Wagoner, she would have sent the charge to defendant's counsel and to her boss Jay Frankenberg, defendant's president. Although Ms. Van Wagoner does not specifically remember whether Mr. Frankenberg told her that plaintiff was a being a nuisance by filing EEOC charges and lawsuits against defendant, she testified that Mr. Frankenberg may have expressed that belief. She further testified that Mr. Frankenberg did not like spending money on lawyers to respond to EEOC charges and lawsuits, among other things.

Defendant maintains that plaintiff's situation warranted discharge because it involved two back-to-back reports of misconduct. Plaintiff presented substantial evidence at trial, however, that defendant received multiple reports of misconduct about other employees and that those employees were only given verbal warnings. For example, in June 1995, Charles Berry was given a verbal warning after defendant received "multiple reportings by female employees of unwelcome verbal conduct of a sexual nature made by Charles Berry to them in the workplace." Bob Armor, Pat Flaherty and Jennifer Van Wagoner all signed off on the verbal notification. In May 1996, three female employees in the service bureau department resigned their employment in light of inappropriate conduct by their supervisor, Roger Almageur. According to notes taken during the exit interview of these employees, Mr. Almageur asked one of the

---

**3.** The court has obtained a transcript of Ms. Van Wagoner's testimony. During the course of her testimony, she responded with "I don't remember," "Not that I remember," "I can't remember," or "I really don't remember" a total of 71 times. She replied, "I don't know" a total of 19 times. She responded with "I don't recall," "I can't recall," or "Not that I recall" a total of 14 times. Finally, she responded, "I have no idea" a total of 3 times. These figures do not even take into account that numerous times she replied, "no" when opposing counsel asked Ms. Van Wagoner whether she remembered certain events.

**4.** Plaintiff, for example, filed an earlier EEOC charge against defendant in 1993 and a subsequent lawsuit in 1995. Plaintiff also filed at least one workers' compensation claim during the course of his employment and a complaint with OSHA.

female employees to engage in sex with him, questioned her about her sexual relationship with her significant other and told her that sex with him (Mr. Almageur) would be better. The notes also reflect a complaint that Mr. Almageur discussed his sex life in front of several female employees in explicit detail, including discussions about engaging in sex with two women at one time. In response to these complaints, Ms. Van Wagoner had a discussion with Mr. Almageur in which they agreed that Mr. Almageur would take the next available sexual harassment course and would not discuss his personal life with employees. Defendant urges that the complaints about plaintiff's conduct are distinguishable because one complaint involved allegations of physical contact. In response, plaintiff introduced evidence that another employee, Chris Shaw, was given only a written warning and brief suspension after pushing another employee down an aisle during a heated exchange.

At the time defendant terminated plaintiff's employment, Johnson County, Kansas (where defendant's facility is located) had an unemployment rate of 2.4 percent. As a result, defendant was having a difficult time hiring and retaining employees as assistant press operators.

*COBRA Notification*

Defendant typically notifies its employees of their rights under the Consolidated Omnibus Budget Reconciliation Act (COBRA) by sending a copy of the notification papers via certified mail. If, however, defendant is terminating the employment of an individual and plans to conduct a final meeting with the employee, a human resources employee will generally give the employee his or her COBRA paperwork at the meeting, assuming there is enough time to prepare the documents in advance of the meeting.

Christine Slavski, an employee in defendant's human resources department, prepared plaintiff's COBRA paperwork on Sunday, August 3, 1997 at Ms. Van Wagoner's request. Ms. Slavski put the completed forms in an envelope, gave the envelope to Janis Shrider, another human resources employee, and placed copies of the forms in defendant's COBRA file. Ms. Slavski was not present at plaintiff's discharge meeting and, in fact, has never been present at a discharge meeting.

Bob Armor and Janis Shrider were present at plaintiff's discharge meeting. Mr. Armor did not give plaintiff any documents during this meeting. He does not recall whether Ms. Shrider gave plaintiff an envelope or any documents during the meeting. Plaintiff remembers receiving some "papers" during the meeting from either Mr. Armor or Ms. Shrider, but believes it was just his final paycheck. Ms. Shrider did not testify at trial.

Plaintiff did not receive his COBRA notification paperwork until January 15, 1998.

## II. Conclusions of Law

Plaintiff claims that defendant failed to promote him to the maintenance mechanic and tool room technician positions on the basis of his race and national origin and terminated his employment in retaliation for filing a charge of discrimination and this lawsuit. Plaintiff also claims that defendant violated the Consolidated Omnibus Budget Reconciliation Act (COBRA), 29 U.S.C. §§ 1161–1168, by failing to provide him timely notice of his entitlement to elect continuation health care coverage upon his termination from employment.

As set forth in more detail below, plaintiff has not persuaded the court that his race or national origin was a motivating factor in defendant's hiring decisions with respect to the maintenance mechanic or tool room technician positions. Accordingly, judgment is entered in favor of defendant on plaintiff's discriminatory failure-to-promote claims. Plaintiff has, however, persuaded the court that defendant terminated his employment in retaliation for engaging in protected activity. Judgment is entered in favor of plaintiff on his retaliation claim and the court awards plaintiff

$14,778.72 in back pay and $25,000.00 in compensatory damages. The court also assesses $50,000.00 in punitive damages and orders defendant to reinstate plaintiff to his assistant press operator position. Finally, defendant has failed to meet its burden of showing that it made a good faith attempt to comply with the COBRA notification requirements. Thus, judgment is entered in favor of plaintiff on his COBRA claim and the court imposes statutory penalties totaling $500.00 against defendant.

### A. Discriminatory Failure–to–Promote Claims

■ To prevail on a claim of race or national origin discrimination under Title VII, plaintiff bears the ultimate burden of proving by a preponderance of the evidence that his race or national origin was a motivating factor in the defendant's promotion decisions. *See Elmore v. Capstan, Inc.,* 58 F.3d 525, 529 (10th Cir.1995) (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Under the shifting burden of proof scheme established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), plaintiff bears the initial burden of establishing a prima facie case of intentional discrimination. *Elmore,* 58 F.3d at 529. Once plaintiff has met this burden, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for its employment action. *Id.* at 530 (citing *McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. 1817). Once defendant has met its burden of production by articulating a facially nondiscriminatory reason for its employment decision, "plaintiff then assumes the normal burden of any plaintiff to prove his or her case at trial." *Id.* (citing *EEOC v. Flasher Co., Inc.,* 986 F.2d 1312, 1316 (10th Cir.1992)). Plaintiff can prevail

either directly by proving the employer acted with a discriminatory motive or

indirectly by showing the stated reason for the discharge was a "pretext for the sort of discrimination prohibited by [Title VII]"—that is, that the facially nondiscriminatory reason was "a cover-up for a racially discriminatory decision." *Id.* (quoting *Flasher,* 986 F.2d at 1316). To do so, "plaintiff must prove only that a discriminatory factor was 'also a reason for the employer's decision' and that it was 'the factor that made a difference.'" *Id.* (quoting *James v. Sears, Roebuck & Co.,* 21 F.3d 989, 992 (10th Cir.1994)).

■ Although the *McDonnell Douglas* framework provides a "basic 'order of presentation of proof' so that the controversy can be increasingly brought into focus," it was never intended to "provide a mechanistic approach to what ultimately becomes a straightforward trial about motive." *Flasher,* 986 F.2d at 1316–17 (citations and quotations omitted). At this stage in the proceedings, after a full trial on the merits, the sequential analytical model adopted from *McDonnell Douglas* drops out of consideration and the court is left with the single overarching issue whether plaintiff has adduced sufficient evidence to warrant the determination that defendant's employment actions were motivated by his race or national origin. *See Fallis v. Kerr–McGee Corp.,* 944 F.2d 743, 744 (10th Cir.1991). In the final analysis, "the court is required to weigh all the evidence and to assess the credibility of the witnesses in order to determine whether the plaintiff was the victim of intentional discrimination based upon protected class characteristics." *Id.* (quoting *Flasher,* 986 F.2d at 1317). The ultimate factual determination of whether the employer's decision was motivated by intentional discrimination based upon protected class characteristics is for the trier of fact. *Id.* (citing *Flasher,* 986 F.2d at 1317 (citing *Pullman–Standard v. Swint,* 456 U.S. 273, 287–88, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982))).[5]

---

5. The court applies the same standards and burdens to plaintiff's § 1981 and KAAD claims as applied to his Title VII claims and

reaches the same conclusions under all statutes. *See Aramburu v. Boeing Co.,* 112 F.3d 1398, 1403 n. 3 (10th Cir.1997).

### 1. Maintenance Mechanic Position

■ The court finds that plaintiff has established a prima facie case of race or national origin discrimination with respect to the maintenance mechanic position. Although defendant argues that plaintiff was not qualified for the position because he cannot weld, and thus, did not establish his prima facie case, plaintiff set forth some evidence indicating that the ability to weld was not a prerequisite for the position and that he could acquire those skills during the position's training period. In support of his assertion, plaintiff introduced at trial the job posting for the maintenance mechanic position. The posting sets forth two distinct categories of information about the position—"specific knowledge and skills required" and "specific duties and responsibilities." Welding is not listed in the "specific knowledge and skills required" section of the posting. Rather, "welding" is cited in the "specific duties and responsibilities" section of the job posting. Moreover, the posting notes that the successful applicant will receive a 90–day training period for the position. Thus, the court concludes that plaintiff has adequately established that he was qualified for the maintenance mechanic position for purposes of establishing his prima facie case. *See Corneveaux v. Cuna Mut. Ins. Group,* 76 F.3d 1498, 1502 (10th Cir.1996) (plaintiff established her qualifications for purposes of prima facie case by proving that she met the listed qualifications and was capable of being trained to meet any unlisted qualifications).

The court also finds that defendant has articulated a legitimate, nondiscriminatory reason for its hiring decision. The woman in human resources who interviewed plaintiff informed him that he would not receive the position because of his inability to weld. Moreover, Greg Lueck testified that he would always choose a candidate with welding experience over a candidate without such experience. Mr. Lueck further testified that defendant had never hired anyone as a maintenance mechanic who did not possess welding experience. Fi-

nally, the successful candidate for the position had welding experience.

■ Plaintiff has not met his burden of persuading the court, as the trier of fact, that his race or national origin was a motivating factor in defendant's hiring decision. As evidence of pretext, plaintiff relies primarily on the fact that he was interviewed for the position by a woman in the human resources department rather than Tom Randel, the lead man in the maintenance department. Defendant offered credible evidence, however, that all interviews for the position were conducted by the human resources department. Plaintiff's only other evidence of pretext is that he was a "solid" candidate for the position and that Max Hankins, the successful candidate, was no more qualified than plaintiff. Defendant, however, does not violate Title VII or § 1981 by choosing a white, American candidate whom it deems qualified over a qualified candidate of Iranian descent and national origin unless it did so with discriminatory intent. *See Durham v. Xerox Corp.,* 18 F.3d 836, 840 (10th Cir.1994) (citing *Burdine,* 450 U.S. at 259, 101 S.Ct. 1089). There is no showing here that defendant chose Max Hankins for any reason other than the fact that defendant believed he was a better candidate. Thus, even assuming that plaintiff was as qualified for the position as Max Hankins, plaintiff has not met his burden of persuading the trier of fact that his race or national origin was a motivating factor in defendant's promotion decision. *See id.*

In short, there was no showing at trial that defendant's proffered reason for failing to select plaintiff for the maintenance mechanic position was pretextual and the court is simply not persuaded, by a preponderance of the evidence, that plaintiff's race or national origin was a motivating factor in defendant's decision to deny him the maintenance mechanic position.

### 2. Tool Room Technician Position

■ The court finds that plaintiff has established a prima facie case of race and

national origin discrimination with respect to the tool room technician position—there were promotional opportunities available that were filled by persons outside the protected class; he applied for the promotion; he was qualified for the promotion; and despite his qualifications he was not promoted. *See Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1362 (10th Cir.1997); *Bauer v. Bailar,* 647 F.2d 1037, 1044 (10th Cir.1981).

The court also finds that defendant has articulated a legitimate, nondiscriminatory reason for failing to select plaintiff for the tool room technician position—the panel's belief that plaintiff would require "constant supervision" and possessed poor verbal skills. Defendant offered evidence that the tool room technician position required an individual to work independently and communicate effectively with others. Defendant has also offered evidence that the interviewing panel believed in good faith that plaintiff's work habits and verbal skills were not in accord with these requirements.

The burden, then, rests on plaintiff to persuade the court, as the trier of fact, that race or national origin was a motivating factor in defendant's decision to deny plaintiff the tool room technician job. *See Elmore v. Capstan, Inc.,* 58 F.3d 525, 529 (10th Cir.1995) (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The court is not so persuaded. In support of his claim, plaintiff relies primarily on Mr. Hansen's comments to plaintiff about plaintiff's "Uncle Saddam." This evidence, however, does not persuade the court that an inference of intentional discrimination is warranted with respect to the panel's promotion decision. The court found Mr. Hansen's testimony with respect to the reasons underlying the panel's recommendation decision to be very credible. Although Mr. Hansen may have made comments that plaintiff found offensive and derogatory (indeed, Mr. Hansen admits he made references to plaintiff's "Uncle Saddam," although he believed that he and plaintiff were joking), the court is simply not persuaded that such comments indicate that plaintiff's race or national origin was a motivating factor in the panel's promotion decision.

Finally, plaintiff suggests that defendant's proffered reasons for its promotion decision is pretextual because Mr. Hansen testified that he verified his conclusions about plaintiff's initiative by visiting with Paul Nickel, among others. Mr. Nickel, however, testified that he never said anything to Mr. Hansen about the degree of supervision required by plaintiff. The court finds that the testimony of Mr. Hansen is not so inconsistent with that of Mr. Nickel as to cause the court to conclude that defendant's articulated reason for its hiring decision is pretextual. Although Mr. Nickel may not have expressly indicated to Mr. Hansen that plaintiff required a significant amount of supervision, Mr. Nickel probably said something to Mr. Hansen that was not particularly helpful to plaintiff's cause. The court believes that Mr. Hansen heard something from Mr. Nickel that, in the end result, reinforced his belief that plaintiff required a high level of supervision and lacked initiative. Thus, any discrepancies in the testimony of these two individuals is best attributed to innocent misrecollection rather than any discriminatory purpose or motive.

In sum, the court is simply not persuaded, by a preponderance of the evidence, that plaintiff's race or national origin was a motivating factor in defendant's decision to deny him the tool room technician position.

### B. Retaliation Claim

Plaintiff claims that defendant terminated his employment in retaliation for his engaging in *protected activity*—the filing of an EEOC charge and subsequent lawsuit. After carefully considering the evidence and arguments presented at trial and assessing the credibility of witnesses, the court is persuaded that defendant unlawfully retaliated against plaintiff when it terminated plaintiff's employment. Judg-

ment is entered in favor of plaintiff on this claim.

### 1. Liability

■ The general approach to Title VII suits set forth in *McDonnell Douglas Corp. v. Green and Texas Dep't of Community Affairs v. Burdine* also applies to retaliation claims under § 704(a). *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 985 (10th Cir.1996) (citing *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984)). Plaintiff must first set forth a prima facie case of retaliation by establishing (1) protected opposition to Title VII discrimination or participation in a Title VII proceeding; (2) adverse employment action by defendant subsequent to or contemporaneous with such protected activity; and (3) a causal connection between such activity and defendant's adverse employment action. *Id.* at 985–86 (citing *Love*, 738 F.2d at 385 (citing *Burrus v. United Tel. Co.*, 683 F.2d 339, 343 (10th Cir. 1982))). Once plaintiff establishes a prima facie case, the burden of production shifts to defendant to articulate a legitimate, nonretaliatory reason for the adverse action. *Id.* at 986 (citing *Love*, 738 F.2d at 385 (citing *Burrus*, 683 F.2d at 343)). If defendant presents evidence of a legitimate business reason, plaintiff must then be allowed to demonstrate that defendant's offered reasons are a mere pretext for retaliation. *Id.* The burden of persuading the court that plaintiff's race or national origin was a motivating factor in defendant's discharge decision remains at all times with plaintiff. *See Elmore v. Capstan, Inc.*, 58 F.3d 525, 529 (10th Cir.1995) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).[6]

■ As an initial matter, the court concludes that plaintiff has established a prima facie case of retaliation. He engaged in protected activity by filing an EEOC charge in October 1996 and a lawsuit in June 1997. Defendant terminated his employment in August 1997. Finally, as described below, a causal connection exists between plaintiff's activity and defendant's adverse employment action.

■ In order to establish a causal connection between his protected activity and defendant's adverse employment decisions, "plaintiff must show that the individual who took adverse action against him knew of [plaintiff's] protected activity." *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir.1993) (citing *Anderson v. Phillips Petroleum Co.*, 861 F.2d 631, 635 (10th Cir. 1988)). Ms. Van Wagoner knew that plaintiff "had filed a number of different things that dealt with the organization," including his EEOC charge in October 1996.[7] The court also concludes that Ms. Van Wagoner received a copy of plaintiff's right-to-sue notice in March 1997. Thus, it is clear that Ms. Van Wagoner had knowledge that plaintiff had engaged in protected activity. Moreover, despite her attempts to deny any involvement in plaintiff's discharge, the court finds that Ms. Van Wagoner in fact did make the decision to terminate plaintiff's employment.[8] Mr. Armor testified that Ms. Van Wagoner left him a voice mail message on August 4, 1997 instructing him to terminate plaintiff's employment. The court found

---

6. The same elements apply to plaintiff's retaliation claim under § 1981. *See Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1103 n. 1 (10th Cir.1998) (citing *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1513 (10th Cir.), cert denied, —— U.S. ——, 118 S.Ct. 626, 139 L.Ed.2d 607 (1997)).

7. Not surprisingly in light of her overall testimony, Ms. Van Wagoner claimed not to remember whether she knew about plaintiff's June 1997 lawsuit at the time of his discharge. Plaintiff, however, claims that his

lawsuit was the subject of rumors in defendant's facility prior to his discharge. A summons was not issued to defendant until November 1997. For that reason, the court finds the evidence to be inconclusive whether Ms. Van Wagoner had knowledge of plaintiff's lawsuit prior to plaintiff's discharge.

8. In its responses to plaintiff's first interrogatories, defendant identifies Ms. Van Wagoner, Mr. Armor and Mr. Flaherty as the individuals who made the decision to terminate plaintiff's employment.

Mr. Armor's testimony very credible. Mr. Flaherty also testified that the termination recommendation came from the human resources department. Although Mr. Flaherty characterized Ms. Van Wagoner's directive as a "recommendation," other evidence indicated that Ms. Van Wagoner's directive was a "done deal" and that any approval by him was considered pro forma. *See Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998) (causal link can be established for purposes of retaliation claim by evidence that the ultimate decisionmaker merely "rubber stamped" a recommendation to terminate by an employee with knowledge of the protected activity). Significantly, Ms. Slavski prepared plaintiff's COBRA paperwork on Sunday, August 3, 1997 at the request of Ms. Van Wagoner. This indicates that the discharge decision was final even before Ms. Van Wagoner left the voice mail message for Mr. Armor. Moreover, Ms. Van Wagoner reported directly to defendant's president, Jay Frankenberg. It was Ms. Van Wagoner's practice to forward all EEOC charges and related information to him. Based on her discussions with Mr. Frankenberg, she knew that he hated spending money on lawyers for EEOC charges and lawsuits. Although Ms. Van Wagoner claims she could not remember specifically whether Mr. Frankenberg had stated that plaintiff was a nuisance for filing charges and lawsuits against the company, her failure to rule out any such statement in the context of her overall testimony leads the court to believe that she and Mr. Frankenberg probably had discussions about plaintiff's activity and the implications of that activity which may have led to the termination decision.

In light of the foregoing, the court concludes that Ms. Van Wagoner had knowledge of plaintiff's protected activity and decided to terminate his employment based on that activity. Ms. Van Wagoner may not have decided to terminate plaintiff's employment based solely on his October 1996 charge. As plaintiff pointed out at trial, Ms. Van Wagoner may have thought that she was "in the clear" because plaintiff had received his right-to-sue in March 1997 and, to Ms. Van Wagoner's knowledge, had not filed a lawsuit. Nonetheless, the court concludes that Ms. Van Wagoner seized the opportunity to terminate plaintiff based on the cumulation of plaintiff's protected complaints—both formal and informal—over the course of his employment.

■ The court also finds that defendant has articulated a facially nonretaliatory reason for terminating plaintiff's employment—two back-to-back complaints about plaintiff's harassing conduct, with one complaint involving allegations of physical touching. The burden then reverts back to plaintiff to demonstrate that defendant's articulated reasons are a mere pretext for retaliation. Plaintiff has met his burden and has persuaded the court that defendant's proffered reasons for plaintiff's discharge were pretextual and that defendant unlawfully retaliated against him.

Throughout the trial of this case, defendant's witnesses consistently maintained that plaintiff's conduct warranted immediate discharge because he was the subject of two back-to-back complaints of harassment, with one complaint involving allegations of physical contact. In light of the evidence presented by plaintiff, however, the court simply does not believe defendant's proffered reasons. First, it is clear that defendant, despite its insistence to the contrary at trial, did not treat as serious the complaints against plaintiff at the time the incidents were reported. When Marci Randel described the nature of her complaint against plaintiff to Ms. Van Wagoner, Ms. Van Wagoner simply explained to Ms. Randel that "she should directly tell [plaintiff] that he should not talk to her in that manner and not to continue the discussion." There is no evidence that Ms. Van Wagoner felt the need to pursue the issue any further after giving this advice to Ms. Randel. Moreover, Mr. Flaherty, the individual to whom Ms. Randel first reported the incident, testified that he did not encourage or suggest to Ms. Van Wag-

**1238**

oner that she (or anyone else) mete out any discipline in response to Ms. Randel's complaint. Similarly, there was no evidence presented at trial that the complaint made by Jarrod Johnson was regarded as serious enough to warrant plaintiff's termination. The memorandum drafted by Ms. Van Wagoner with respect to her discussion with Mr. Johnson does not reflect that Ms. Van Wagoner intended to take any further action with respect to his complaint. Thus, the court does not believe that defendant, at the time of the reportings, perceived the complaints of Ms. Randel or Mr. Johnson as serious enough to warrant significant disciplinary action against plaintiff. In fact, contrary to its own policy, defendant did not even interview plaintiff with respect to the allegations.

Other evidence presented at trial persuades the court that defendant's proffered explanation for plaintiff's discharge is pretextual. Bob Armor testified that he was uncomfortable with the termination decision and questioned whether an employee could be terminated based solely on the alleged incidents. When the court asked Pat Flaherty whether he considered the conduct sufficient to warrant discharge, Mr. Flaherty was visibly uncomfortable and struggled to articulate a response. Mr. Flaherty also testified that it was unusual that plaintiff was not asked for his side of the story prior to his discharge.

Plaintiff presented substantial evidence at trial that defendant treated similarly situated employees differently. Specifically, plaintiff compared his treatment with that received by Charles Berry and Roger Almageur. Mssrs. Berry and Almageur were the subjects of sexual harassment complaints, at least one of which was surely deemed by defendant to be considerably more serious than Ms. Randel's complaint against plaintiff. In June 1995, several female employees complained that Mr.

Berry had made unwelcome comments of a sexual nature in the workplace. He was not discharged and, in fact, received only a verbal warning. Bob Armor, Pat Flaherty and Jennifer Van Wagoner signed off on the verbal notification. In May 1996, three female employees in the service bureau department resigned their employment in light of inappropriate conduct by Mr. Almageur. Mr. Almageur, a supervisor, was accused of asking one of his female subordinates to engage in sex with him, of questioning her about her sexual relationship with her significant other and telling her that sex with him (Mr. Almageur) would be better. He was also alleged to have discussed his sex life in front of several female employees in explicit detail, including discussions about engaging in sex with two women at one time. In response to these complaints, Ms. Van Wagoner had a discussion with Mr. Almageur (which did not occur with plaintiff) in which they agreed that Mr. Almageur would take the next available sexual harassment course and would not discuss his personal life with employees. No further action was taken.

Defendant urges that plaintiff's conduct is distinguished from other employees who engaged in inappropriate behavior but received more lenient treatment because one complaint against plaintiff involved allegations of physical contact. Again, the court does not believe defendant's explanation and views it instead as a mere attempt to justify an action for which no lawful explanation exists. Bearing on the court's conclusion here is evidence presented at trial that another employee, Chris Shaw, was given only a written warning and brief suspension after pushing another employee down an aisle during a heated exchange. Plaintiff's alleged behavior, albeit annoying, seems strikingly short of the kind of touching which would rise to the level of seriousness claimed by defendant at trial.[9]

---

9. The court also bears in mind that defendant repeatedly argued during the course of the trial that, in light of the low unemployment rate in Johnson County and the resulting difficulty defendant experienced in hiring and retaining assistant press operators, it would not have terminated plaintiff unless absolutely

The court wishes to make clear that it respects the rights of management to make disciplinary decisions in the workplace. The court is not second-guessing the abstract fairness of the procedures employed. It recognizes that bad, and even unfair, decisions can be made without unlawful motivations. What the court does conclude here, in the strongest of terms, is that defendant's purported rationale so does not hold up, that its procedures were so off the mark, and that the credibility of the main actor in the decisionmaking process (Ms. Van Wagoner) was so bad, that the court is firmly convinced that the decision to terminate plaintiff's employment was unlawfully retaliatory.

### 2. Remedy

Having concluded that defendant unlawfully retaliated against plaintiff, the court turns to address the appropriate remedy for the violation. Under Title VII, the court may award a successful plaintiff any appropriate relief, including reinstatement, back pay "or any other equitable relief" the court deems appropriate. *See* 42 U.S.C. § 2000e–5(g). Moreover, the Civil Rights Act of 1991 expressly provides that a successful Title VII plaintiff may recover compensatory and punitive damages. *See* 42 U.S.C. § 1981a(a).[10]

■■■ The court turns first to the issue of back pay. Ordinarily, a back pay award covers the time period up until the date of judgment. *See Daniel v. Loveridge*, 32 F.3d 1472, 1477 (10th Cir.1994). The amount of back pay awarded to a successful Title VII plaintiff is committed to the sound discretion of the district court. *See id.; Whatley v. Skaggs Cos.*,

707 F.2d 1129, 1138 (10th Cir.1983). *See also Ziegler v. K–Mart Corp.*, 74 F.3d 1250, 1996 WL 8021, at *6–7 (10th Cir. Jan.10, 1996) (noting the "wide latitude" afforded the trial court in fashioning a back pay award).

■■■ The court concludes that an award of back pay is appropriate and necessary to make plaintiff whole in this case. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418–21, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (once liability is established, back pay should generally be awarded unless special circumstances exist). In support of his claim for back pay, plaintiff has presented evidence that defendant's unlawful termination of his employment has resulted in lost income and benefits totaling $29,557.44. Although defendant argued at trial that plaintiff did not mitigate his damages, it offered no evidence to rebut the accuracy of plaintiff's calculations and, thus, apparently concedes that plaintiff's representations as to the amount of lost income and benefits is accurate.

■■■ Clearly, plaintiff had an obligation to use reasonable methods to mitigate his damages. *See* 42 U.S.C. § 2000e–5(g)(1) (amounts earnable with reasonable diligence reduces back pay allowable); *EEOC v. Sandia Corp.*, 639 F.2d 600, 627 (10th Cir.1980). The law does not require plaintiff to be successful in mitigation, but only requires that he make an honest, good faith effort to mitigate damages by seeking other positions. *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1158 (10th Cir.1990) ("A claimant need only make a reasonable and good faith effort, and is not held to the highest standards of diligence."); *Sandia*

---

necessary. The court, however, finds that this evidence actually bolsters plaintiff's showing of pretext. In light of defendant's great need for assistant press operators, the court simply does not believe that it terminated plaintiff for the reasons articulated. Rather, the court concludes that defendant used these two complaints as an excuse to discharge an employee who had been a "nuisance" by complaining about discriminatory treatment in the workplace.

10. For purposes of this case, it is irrelevant whether plaintiff recovers compensatory and punitive damages under § 1981 or whether he recovers those damages under Title VII. The court, however, is not awarding plaintiff damages under both statutes. *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1110 (10th Cir.1998) (suggesting that a double recovery under § 1981 and Title VII may be impermissible).

*Corp.*, 639 F.2d at 627. Moreover, the employer (here, defendant) bears the burden of showing a lack of reasonable diligence. *Id.* The Tenth Circuit has held that defendant may satisfy that burden by showing "(1) that the damage suffered by plaintiff could have been avoided, i.e. that there were suitable positions available which plaintiff could have discovered and for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position." *Sandia Corp.*, 639 F.2d at 627 (quoting *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir.1978)). Defendant has not met that burden here. Specifically, defendant failed to introduce evidence that suitable positions were available to plaintiff during the relevant time period. Rather, defendant simply introduced evidence that plaintiff would not have accepted a job that paid less than $11 per hour (the equivalent of what he had been earning at defendant at the time of his discharge) and that the unemployment rate in Johnson County at the time of plaintiff's discharge was 2.4 percent.

Nonetheless, the court is not inclined to award plaintiff $29,557.44 in back pay. Plaintiff was earning $10.39 per hour at the time of his discharge. In light of the unemployment rate in Johnson County, the court is convinced that plaintiff could have found other employment and earned at least minimum wage, or half of his hourly wage at defendant. *See* 29 U.S.C. § 206 (setting minimum wage at $5.15 per hour). There is no reason why plaintiff should not or could not have obtained some gainful employment over this period, even if the impediments discussed below might have prevented him from obtaining comparable employment. Thus, the court concludes that a back pay award of $14,778.72 (half the amount requested by plaintiff) is sufficient to make plaintiff whole for his injuries.

■ Compensatory damages are ordinarily awarded for emotional pain, suffering, mental anguish and other nonpecuniary losses. *See* 42 U.S.C. § 1981a(b)(3).

While plaintiff's testimony was "not the most graphic and detailed display of emotional and mental anguish and distress," the court concludes that the evidence supports some award for such anguish and distress. *See Wulf v. City of Wichita*, 883 F.2d 842, 875 (10th Cir.1989). Plaintiff testified that his discharge caused him a great deal of stress and adversely affected his relationship with his family. Specifically, he explained that his relationship with his daughter became strained because he could not provide her any information about the reasons for his discharge other than the fact that two employees had complained about purported harassing conduct. According to plaintiff, his daughter believed that plaintiff was trying to hide the true reason for his discharge and "had done something wrong" at work. Moreover, plaintiff believes that his discharge led to his separation from his wife. Prior to his discharge, plaintiff had been saving money to buy a house for his family and had been putting some money away for retirement. His wife apparently believed that he could not adequately provide for her after his discharge. In fact, she left plaintiff the day after his discharge and has not returned. In light of plaintiff's testimony, the court concludes that an award of twenty-five thousand dollars ($25,000.00) is appropriate to compensate plaintiff for his emotional distress. *See id.* (remanding § 1983 action for reconsideration of compensatory damages award and stating that award should be no greater than $50,000 where plaintiff testified only that his job loss was "very stressful," that he was angry, depressed, scared and frustrated and had experienced financial difficulties).

■ The court now turns to address whether reinstatement or front pay is the appropriate remedy to redress plaintiff's future losses. Reinstatement and front pay are mutually exclusive remedies for the same injury. *James v. Sears, Roebuck & Co.*, 21 F.3d 989, 997 (10th Cir. 1994) (ADEA case) (citing *Anderson v.*

*Phillips Petroleum Co.,* 861 F.2d 631, 637 (10th Cir.1988)). Front pay refers to the award of money as compensation for the future loss of earnings. *Id.* (citation omitted). Reinstatement, however, is the preferred remedy in employment discrimination cases and should be ordered whenever it is appropriate. *See id.* (citing *EEOC v. Prudential Fed. Sav. & Loan Ass'n,* 763 F.2d 1166, 1172 (10th Cir.1985)). The decision to award front pay or to order reinstatement as the appropriate remedy is a matter for the discretion of the trial court. *Id.* (citing *Denison v. Swaco Geolograph Co.,* 941 F.2d 1416, 1426–27 (10th Cir. 1991)).

■■■ Plaintiff testified that he desired reinstatement to his assistant press operator position. According to plaintiff, he has had great difficulty securing other employment in light of the circumstances surrounding his discharge from defendant. When potential employers ask plaintiff his reasons for leaving defendant, he tells them the truth—that he was terminated for alleged sexual harassment. Understandably, these employers have shied away from hiring plaintiff. Significantly, defendant did not oppose reinstatement and did not suggest that reinstatement was unworkable for any reason. *See id.* (reinstatement may not be appropriate where evidence shows that a "productive and amicable working relationship would be impossible") (quoting *Prudential Fed. Sav.,* 763 F.2d at 1172). Moreover, the court has no basis to conclude that reinstatement would be unworkable here. Despite plaintiff's history of complaints about defendant, the undisputed evidence at trial indicated that his performance as an assistant press operator was satisfactory or better. In light of the foregoing, the court orders defendant to reinstate plaintiff to the assistant press operator position at a salary and benefit level commensurate with the compensation that he would have received if he had remained employed at defendant. *See id.* (affirming district court's reinstatement order at a salary and benefit level as if plaintiffs had never been discharged).

■■■ Lastly, the court turns to address the issue of punitive damages. In a Title VII case, punitive damages may be awarded "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The defendant's acts need not have been "extraordinarily egregious" to support a finding of punitive damages. *Adakai v. Front Row Seat, Inc.,* 125 F.3d 861, 1997 WL 603458, at *2 (10th Cir. Oct.1, 1997) (citing *Luciano v. Olsten Corp.,* 110 F.3d 210, 220 (2d Cir. 1997)). The requisite level of recklessness or outrageousness required to support punitive damages can be inferred from management's participation in the discriminatory conduct. *Id.* (citing *Kim v.. Nash Finch Co.,* 123 F.3d 1046, 1066 (8th Cir.1997) (quotation omitted)). The court has concluded that Ms. Van Wagoner, defendant's human resources manager, made the crucial decision to terminate plaintiff's employment in retaliation for plaintiff's engaging in protected activity. Ms. Van Wagoner testified that she knew at the time plaintiff was discharged that it was illegal to retaliate against an employee who had filed EEOC charges or lawsuits. While Ms. Van Wagoner may not have been acting with malice, at the very least she demonstrated reckless indifference to plaintiff's federally protected rights when she caused the termination of his employment. It is incumbent upon an employer to have a human resources manager, usually the key position in terms of understanding and implementing anti-discrimination laws, who, whether or not encouraged by upper level management to deviate from the law, will ensure that vital civil rights protections are not ignored or by-passed. It is important that others up and down the line carrying out employment decisions be sensitive to the importance of these laws in our society. Therefore, the court finds that, although Ms. Van Wagoner is no longer employed

by defendant, an award of punitive damages in the amount of fifty thousand dollars ($50,000.00) is appropriate and necessary to deter future retaliatory conduct on the part of defendant.

### C. COBRA Claim

COBRA requires employers, if a qualifying event occurs, to provide former employees the opportunity to continue health care coverage under the employer's plan at the former employee's expense. 29 U.S.C. § 1161; *Smith v. Rogers Galvanizing Co.,* 128 F.3d 1380, 1383 (10th Cir.1997), *reh'g on other grounds,* 148 F.3d 1196 (10th Cir.1998). Qualifying events include termination of employment for any reason other than gross misconduct. 29 U.S.C. § 1163. When a qualifying event occurs, the employer must notify the plan administrator of the qualifying event within thirty days of the event. *Id.* § 1166(a). The plan administrator is responsible for notifying beneficiaries of their right to receive continuation coverage within fourteen days after it receives notice of the qualifying event. *Id.* § 1166(a) & (c). The Tenth Circuit has held that, in an action for benefits under COBRA, the plan administrator bears the burden of proving that adequate COBRA notice was given. *Rogers Galvanizing,* 128 F.3d at 1383 (citing *Stanton v. Larry Fowler Trucking, Inc.,* 52 F.3d 723, 728–29 (8th Cir.1995)).

Defendant was both the sponsor and the administrator of the insurance plan. Thus, it was defendant's duty under COBRA to timely notify plaintiff that he could elect continuation coverage.[11] Although defendant maintains that proper notification was given to plaintiff on the day of his discharge, plaintiff alleges that he did not receive notice of his COBRA rights until January 15, 1998—more than five months after his discharge.

Although COBRA contains no specific requirements as to the manner in which notice must be given, the Tenth Circuit has recognized that "a good faith attempt to comply with a reasonable interpretation of the statute is sufficient." *Rogers Galvanizing,* 128 F.3d at 1383–84. The vast majority of courts adopting this "good faith" standard share the view that COBRA compliance does not require proof that the former employee actually received notice. *See, e.g., Keegan v. Bloomingdale's, Inc.,* 992 F.Supp. 974, 977–78 (N.D.Ill.1998); *Lawrence v. Jackson Mack Sales, Inc.,* 837 F.Supp. 771, 783 (S.D.Miss. 1992) *(cited with approval in Rogers Galvanizing ); Myers v. King's Daughters Clinic,* 912 F.Supp. 233, 236 (W.D.Tex. 1996); *Jachim v. KUTV Inc.,* 783 F.Supp. 1328, 1333 (D.Utah 1992) *(cited with approval in Rogers Galvanizing ).*

■ Defendant has not met its burden of showing that adequate COBRA notice was given. Defendant's evidence at trial demonstrated only that Ms. Slavski prepared plaintiff's COBRA paperwork on August 3, 1997, put the completed forms in an envelope and gave the envelope to Ms. Shrider. Ms. Slavski was not present at plaintiff's discharge meeting. Although Ms. Shrider was present at the meeting, she did not testify at trial and, consequently, the court has no information with respect to Ms. Shrider's standard COBRA notification practices or whether she attempted in good faith to deliver the documents to plaintiff. Thus, the court concludes that defendant has not met its burden of showing a good faith attempt to comply with the notification requirements of COBRA.

■ The court turns, then, to address the appropriate remedy. Plaintiff did not incur any medical bills or related expenses

---

11. Courts are split on whether an employer who is also a plan administrator has fourteen days or forty-four days to notify a beneficiary. *See Roberts v. National Health Corp.,* 963 F.Supp. 512, 515 (D.S.C.1997), *aff'd,* 133 F.3d 916, 1998 WL 10375 (4th Cir.1998) (discussing cases and noting conflict). Resolution of this issue is not necessary here because the court has declined plaintiff's invitation to assess a penalty of $100 per day and instead assesses a lump sum penalty of $500.

during the relevant period. He does, however, seek statutory penalties in the amount of $100 per day from August 4, 1997 through January 9, 1998.[12] Although COBRA permits the court to assess statutory penalties of up to $100 per day against a plan administrator for failure to comply with notice requirements, the imposition of penalties is committed to the discretion of the trial court. *See* 29 U.S.C. § 1132(c)(1).

Here, plaintiff does not claim to have been prejudiced or injured in any way as a result of defendant's failure to notify him of his COBRA rights. Although plaintiff vaguely testified that he needed to go to the doctor but declined to do so because he was not insured, he did not point the court to any specific medical problems for which he desired to seek medical treatment. He referred only to a routine dental examination that he elected to cancel. Moreover, there was no showing at trial that defendant acted in bad faith or otherwise intentionally withheld plaintiff's COBRA notification paperwork. At most, the evidence demonstrated a possible oversight on the part of defendant. In the absence of any showing of prejudice to plaintiff or bad faith on the part of defendant, the court is not inclined to impose penalties to the extent requested by plaintiff and, instead, imposes a lump sum penalty of five hundred dollars ($500.00) to deter defendant from similar oversight in the future. *See Moothart v. Bell*, 21 F.3d 1499, 1506 (10th Cir.1994) ("[N]either prejudice nor injury are prerequisites to recovery under the penalty provisions of the statute. Instead, these are factors the district court may consider in deciding whether to exercise its discretion to award a penalty."); *see also Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1068–69 (6th Cir.1994) ("Many courts have refused to impose any penalty at all

under § 1132(c)(1)(B) in the absence of a showing or prejudice or bad faith.") (citing *Rodriguez–Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 588–89 (1st Cir. 1993); *Godwin v. Sun Life Assurance Co. of Canada*, 980 F.2d 323, 328–29 (5th Cir. 1992)); *Boucher v. Williams*, 13 F.Supp.2d 84, 105 (D.Me.1998) (declining to impose penalties under § 1132(c)(1) where plaintiff failed to show he suffered any harm or prejudice due to lack of notice and did not suggest that defendant's failure to notify him of his rights was intentional or demonstrated bad faith); *Powell v. Wilmington Plumbing Supply Co.*, 921 F.Supp. 1264, 1273 (D.Del.1996) (imposing penalties of $20 per day where defendant "technically violate[d] the COBRA notice requirement," but plaintiff did not prove she incurred any uncompensated medical expenses during the interim period); *Kost v. United Parcel Serv., Inc.*, Civ.A. No. 95–4144–DES, 1996 WL 459815, at *2–3 (D.Kan. July 11, 1996) (refusing to impose penalties where plaintiff did not suffer any injuries or prejudice and did not show bad faith on the part of defendant); *Burgess v. Adams Tool & Engineering, Inc.*, 908 F.Supp. 473, 478 (W.D.Mich.1995) (refusing to impose penalties where plaintiffs failed to show evidence of prejudice or bad faith).

**IT IS THEREFORE ORDERED BY THE COURT THAT** judgment be entered in favor of defendant Graphic Technology, Inc. on plaintiff's discriminatory failure-to-promote claims.

**IT IS FURTHER ORDERED BY THE COURT THAT** judgment be entered in favor of plaintiff Bijan Daneshvar on his claim of retaliation in the amount of $14,778.72 in back pay; $25,000.00 in compensatory damages; and $50,000.00 in punitive damages, and that judgment be entered in

---

12. Although the issue is not relevant in light of the court's decision to impose a statutory penalty of $500 (rather than plaintiff's request of $100 per day), daily penalties could not be assessed from the day of plaintiff's discharge. As discussed in note 11 of this opinion, defendant would have had either a 14– or 44–day grace period in which to give plaintiff notice.

Thus, the appropriate measure for calculating any daily penalties would begin on either August 18, 1997 or September 18, 1997. Moreover, it is unclear why plaintiff's proposed stop-date is January 9, 1998 rather than January 15, 1998, the day he received notice. In any event, this, too, is not relevant to the court's analysis here.

favor of plaintiff on his COBRA claim in the amount of $500.00.

IT IS SO ORDERED.