Arthur ROBINSON, Plaintiff–Appellee and Cross–Appellant,

v.

CITY AND COUNTY OF DENVER, Defendant–Appellant and Cross–Appellee.

No. 98CA2566.

Colorado Court of Appeals, Div. II.

Aug. 17, 2000.

Certiorari Denied Aug. 20, 2001.

J. Wallace Wortham, Jr., Denver City Attorney, Richard A. Stubbs, Assistant City Attorney, Denver, Colorado, for Defendant–Appellant and Cross–Appellee.

Burns, Wall, Smith and Mueller, P.C., James C. Fattor, Denver, Colorado; Rita Byrnes Kittle, P.C., Rita Byrnes Kittle, Denver, Colorado, for Plaintiff-Appellee and Cross-Appellant.

Opinion by Judge DAILEY.

Defendant, City and County of Denver (City), appeals from a judgment entered on a jury verdict in favor of plaintiff, Arthur Robinson. The City claims that the evidence does not support the jury's finding of a racially hostile work environment, that, in any event, a new trial is required because of instructional error, and that plaintiff was not entitled to an award of attorney fees. The plaintiff cross-appeals the trial court's order directing a verdict on one of his claims. We affirm.

## I. Background

Plaintiff, a black man, has worked in the City's Wastewater Management Division (WMD) since 1967 and has been a first level supervisor in its quality control section for much of that time. In February 1997, he instituted the present action, alleging illegal discrimination under 42 U.S.C. §§ 2000e, et seq. (1999) (Title VII) and 42 U.S.C. § 1981 (1999) (§ 1981), in that he had been subject both to a racially hostile work environment and to disparate treatment because he was black.

In late December 1994, a letter derogatory toward "dark-skinned people" was taped on the wall near the elevator in the WMD building. WMD management (management) made no response to this letter.

In February 1995, two anonymous letters were posted in the WMD building. The first, supposedly authored by "32 Wastewater employees," complained that, in response to a prior television expose about lax WMD field employees, management required three groups of employees "made up mostly of people of color ... to call in on radios for every move we make" while not requiring a fourth group of mainly "white people" to do likewise. The second letter was posted approximately a week after, and in response to, the first letter. The second letter stated that the first letter authors' "feeble attempt at writing" showed that the writers of the first letter "don't have enough mental capacity to do anything else but labor" and concluded:

> For you to insinuate that racism is involved, instead of sheer stupidity only serves to illustrate that you are a mindless dreg in the bottomless pit of human garbage.

Management did not respond to the letter, other than to remove it.

In August 1995, the restroom walls in the WMD building were marked with racist writings on two separate occasions. The first writing consisted of the words "nigger lover" and a drawing of a woman with large breasts, a large posterior, and three black men with erections; and the second consisted of the words "Leslie = Nigger Lover" and "Leslie is a Nigger Lover."

On each occasion, management removed the writing as soon as it was discovered and contacted the Denver Police Department for assistance. Additionally, after the second writing, management issued a memo condemning vandalism—but not racism—in the building.

The plaintiff and another black employee requested that management provide mandatory diversity training for all WMD employees. Although management had previously provided mandatory sexual harassment training when sexual harassment had been identified as a problem, it declined to provide mandatory diversity training, citing, as its reason, the expense involved. Management did meet for about ten minutes with WMD employees to condemn vandalism and spent about approximately thirty seconds also condemning racism.

In September 1995, another racist marking, consisting of a single word, "nigger," appeared upon a restroom wall in the WMD building.

Once again, management removed the writing and contacted the Denver Police Department. Nearly two weeks after the writing was discovered, management issued a memo reminding employees that "any racial overtones, remarks, graffiti and sexual harassment will not be tolerated." At management's invitation, two employees developed a poster promoting racial and ethnic tolerance. However, no copies of the poster were ever produced, and the poster was never put up in the building.

Racial epithets continued to occur. For example, as a member of the plaintiff's crew was taking a sample to the lab, a co-worker complained about being treated "like the low nigger on the totem pole." Although this was reported to the second line supervisor, nothing was done about it for six months, and the offending employee received only a verbal reprimand. According to the evidence presented, this was not an isolated incident, and nothing was done on some other occasions when racial slurs were reported to management.

In February 1997, a post-it note that said "Sucks Nigger Dicks" was left on a woman's lunch bag in the WMD lunchroom refrigerator. In response, two black members of management compared the handwriting on the note to that of all 285 WMD employees, identified two or three possible matches, and provided this information to a handwriting expert.

More racist writings appeared in November 1997 and June 1998 derogatorily referring to sexual relations between an Hispanic woman and two black men. And, WMD's maintenance employee testified that he found approximately ten other racist writings, half of which he reported to management.

Plaintiff presented evidence about the different way management had responded to threats, depending upon the race of the person making or receiving the threats. According to plaintiff, one white employee he supervised had threatened him several times a year over a 25–year period, but nothing was done when plaintiff reported those threats to his manager. When the white employee threatened "to get his gun and blow [plaintiff's] head off," stating, "I will bring my Mach 10 here," management gave the employee only a verbal reprimand.

In contrast, two black employees and an Hispanic employee who threatened or argued with white employees or supervisors were either suspended or placed on administrative leave while the matters were investigated.

However, other evidence (elicited primarily by plaintiff) revealed that a Hispanic employee had been suspended for threatening an Hispanic supervisor; a white contract employee had been terminated for threatening a black employee; and another white employee had been terminated for threatening supervisors.

The plaintiff also presented evidence of: a) a condescending attitude by management towards him during supervisor meetings; b) an instance of racial stereotyping by a member of management; and c) disparate treatment of black employees with respect to working conditions, pay, and promotions.

Plaintiff testified that he felt shocked, demeaned, angered, threatened, and, ultimately, without hope, as a result of the racial slurs, the racist writings, the disparate treat-

ment of blacks, and management's unwillingness to respond effectively thereto.

The City presented evidence why it responded as it did to these racist incidents. It contested plaintiff's evidence regarding some of the racial stereotyping and the number of times he had been threatened at work; and produced evidence that 1) blacks were employed at almost every level (including the number two position) in WMD, 2) on at least one occasion, black employees had received greater pay increases than everyone else, 3) white supervisors had been subjected to the same working conditions as had plaintiff, and 4) diversity training was provided for WMD employees in January 1997.

The trial court dismissed plaintiff's § 1981 claims, concluding that he had presented insufficient evidence that the City promoted racial discrimination through custom or policy. Plaintiff's Title VII claims, however, were submitted to the jury, which found for the City on the disparate treatment claim, but for the plaintiff on the hostile work environment claim. The jury awarded the plaintiff $165,000 in damages and the court awarded him $207,525.86 in attorney fees and costs.

## II. Sufficiency of Evidence

The City contends that the evidence is insufficient as a matter of law to support the jury's verdict finding for the plaintiff. We disagree.

### A.

According to the City, only the evidence relating to the February 1995 letters, the three instances of restroom markings which occurred in August and September 1995, the racial slur by the co-worker, and the February 1997 post-it note, could be considered with respect to the plaintiff's claim of a racially hostile work environment. This evidence, the City argues, was insufficient to make out a prima facie case on such a claim.

The City's position is premised largely on the contention that evidence of disparate treatment in disciplinary actions, pay and promotions, personal security, and working conditions, is irrelevant in establishing a claim of a racially hostile work environment.

42 U.S.C. § 2000e–2(a) provides that: "It shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."

■ Among other things, 42 U.S.C. § 2000e–2(a) prohibits discriminatorily hostile or abusive work environments, *i.e.,* environments in which impermissible discrimination detracts from an employee's job performance, discourages employees from remaining, or keeps employees from advancing in their careers. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

■ To show a hostile work environment, the discriminatory conduct must not only be bothersome to the individual employee, it must also be "severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Systems, Inc., supra,* 510 U.S. at 21, 114 S.Ct. at 370, 126 L.Ed.2d at 302.

■ No precise test has been established for determining whether an environment is sufficiently "hostile or abusive" to sustain an action under the statute. Only by evaluating the totality of the circumstances can such a determination be made. Factors to consider include: (1) the frequency of the discriminatory conduct; (2) whether the conduct is physically threatening or intimidating as opposed to a mere offensive utterance; and (3) whether the conduct unreasonably interferes with the employee's work performance. *See Harris v. Forklift Systems, Inc., supra* (sexually hostile work environment); *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)(standards for assessing actionable sexual and racial harassment should generally be harmonized).

■ Under the *Forklift Systems* test, a few isolated incidents of racial comments, slurs, or jokes will not constitute a hostile work environment. Rather, there must be a steady barrage of activity which cumulatively

affects the conditions of employment. *Schwapp v. Town of Avon,* 118 F.3d 106 (2d Cir.1997).

■ Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination" of the action more probable or less probable than it would be without the evidence." CRE 401. While, under Title VII, an actionable environment must be subjectively abusive to the victim, *Harris v. Forklift Systems, Inc., supra,* matters which the victim has not experienced firsthand can be probative of the existence of a subjectively abusive environment. *See Schwapp v. Town of Avon, supra.*

■ Similarly, under the totality of circumstances test, there is no prohibition against considering, in connection with a hostile work environment claim, evidence which also tends to prove a disparate treatment claim. *See Hicks v. Gates Rubber Co.,* 833 F.2d 1406 (10th Cir.1987) (harassment or unequal treatment of an individual because of sex, if sufficiently patterned or pervasive, would support a hostile work environment claim); *Stahl v. Sun Microsystems, Inc.,* 19 F.3d 533, 538 (10th Cir.1994)("trial court should consider any harassment or unequal treatment based on sex even if those acts are not themselves sexual in nature").

■ Here, evidence concerning WMD's disparate treatment of plaintiff in staff meetings, in the conditions under which he worked, and, most prominently, when threatened with severe personal harm by another, was relevant to show the existence of an abusive or hostile work environment. In addition, evidence of disparate treatment within the department which did not directly affect the plaintiff was relevant to show the racial climate of the work place and to place other facts in context. *See Schwapp v. Town of Avon, supra* (all circumstances are considered to obtain a realistic view of the work environment).

The City relied on *Bolden v. PRC, Inc.,* 43 F.3d 545 (10th Cir.1994), for the proposition that evidence of unequal treatment is discrete from evidence of abusive conduct. In *Bolden,* the court considered abusive conduct when evaluating the hostile work environment, and the City here contends the *Bolden* court refused to consider the evidence of disparate treatment. There is, however, no indication that the evidence would have been relevant because the *Bolden* court found that the disparate treatment claim was nothing more than a general allegation. The court gave no indication that there would be a legal barrier to considering such evidence in a hostile environment claim. Hence, we conclude that the City's reliance on *Bolden* is misplaced.

■ When, as here, sufficiency of the evidence is challenged on appeal, we must determine whether the evidence, viewed as a whole and in the light most favorable to the prevailing party, is sufficient to support the jury's verdict. It is the sole province of the jury to resolve disputed issues of fact and to determine the credibility of the witnesses, the weight to be accorded the testimony, and the inferences to be drawn from the evidence. If there is competent evidence to support a jury verdict, we will not disturb it on appeal. *Karg v. Mitchek,* 983 P.2d 21 (Colo.App.1998).

■ In our view, the evidence, when viewed in its totality, was sufficient to permit a reasonable jury to determine that a racially hostile work environment existed. *See Schwapp v. Town of Avon, supra* (racially hostile work environment established through evidence of 12 incidents—eight of which plaintiff did not directly experience but was told about — over 20–month period); *Smith v. Norwest Financial Acceptance, Inc.* 129 F.3d 1408 (10th Cir.1997)(six sexually and/or racially harassing statements over 23 months sufficiently pervasive to support hostile work environment claim).

### B.

Alternatively, the City argues that it cannot be held liable here because the evidence established as a matter of law that the City responded reasonably and appropriately to incidents of racially-based harassment. We are not persuaded.

■ An employer is liable for its negligence in failing to uncover *and* respond to the harassing acts of co-workers. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 666–67 (10th Cir.1998)(stating that "the touchstone for the evaluation of an employer's response . . . is reasonableness," and inquiring "whether the remedial and preventive action was 'reasonably calculated to end the harassment.' ").

■ An employer is also vicariously liable for harassing acts committed by supervisors with either immediate or successively higher authority over an employee, unless the employer proves, as part of an affirmative defense, that the employer exercised reasonable care to prevent and correct promptly any harassing behavior. *Faragher v. City of Boca Raton, supra* (affirmative defense unavailable, however, unless employer also shows (1) no tangible adverse employment action, *e.g.,* demotion or termination, occurred; and (2) the employee unreasonably failed to take advantage of any of the employer's preventive/corrective measures or to otherwise avoid harm).

■ Here, the City asks us to review the evidence and make a determination as a matter of law that its corrective actions were reasonable under the circumstances. We cannot do so. Although there is some evidence supporting the City's position, there is also evidence from which the jury could have concluded that the City's responses were not reasonably calculated to end the harassment.

Under these circumstances, we may not disturb the jury's verdict. *See Klein v. State Farm Mutual Automobile Insurance Co.,* 948 P.2d 43 (Colo.App.1997)(every reasonable inference that may be drawn from the evidence must be drawn in favor of the party favored by the verdict, and judgment notwithstanding the verdict entered only if a reasonable person could not have reached the same conclusion as the jury); *see also Baty v. Willamette Industries, Inc.,* 172 F.3d 1232 (10th Cir.1999)(denying employer's motion for judgment as a matter of law on sexual harassment claim).

### III. Instructional Error

The City next contends that the trial court erred in instructing the jury on employer liability for hostile work environments.

The jury was given an instruction that correctly stated the City's burden with respect to an affirmative defense to liability where, as here, no tangible adverse employment actions were taken and where acts of harassment may have been committed by one or more of plaintiff's direct supervisors. *See Faragher v. City of Boca Raton, supra.*

Such instruction was not, however, limited by its own language to the supervisor context. Consequently, the jury could have applied the instruction to co-employee harassment for which: 1) plaintiff had the burden of ultimately persuading the jury of the unreasonableness of the City's response, and 2) plaintiff's efforts to avoid harm were irrelevant. *See Adler v. Wal–Mart Stores, Inc., supra.*

The City complains that the instruction in question improperly shifted to it the burden of proof on issues relating to co-worker harassment. Conceding that it did not raise this objection in the trial court, the City requests a new trial under the plain error doctrine.

■ Ordinarily, objections made to instructions for the first time on appeal in civil cases will receive no consideration by an appellate court. *Bohlender v. Oster,* 165 Colo. 164, 439 P.2d 999 (1968). On rare occasion, though, "a reviewing court may exercise its discretion and soften this rule when it is necessary to do justice and avoid manifest error." *Gorsich v. Double B Trading Co.,* 893 P.2d 1357, 1364 (Colo.App.1994). *See Blueflame Gas, Inc. v. Van Hoose,* 679 P.2d 579 (Colo.1984)(finding instructional plain error).

■ However, "[t]he use of the plain-error exception to the normal rules of appellate practice must be confined to the most compelling cases, especially in civil, as opposed to criminal, litigation." *Johnson v. Ashby,* 808 F.2d 676 (8th Cir.1987) (fn.3). Further, the plain error standard "deserves more stringent application to civil jury instructions," because C.R.C.P. 51 explicitly

warns counsel of the need to raise objections to instructions and, "unlike objections to evidence, jury instructions are not spur-of-the-moment matters." *Chute v. Sears Roebuck & Co.*, 143 F.3d 629, 631 (1st Cir.1998).

Indeed, a properly timed objection to an instruction provides "the trial judge with a chance to focus on the issue and, if need be, . . . to correct the judge's [error] at a time when the mistake can be easily and efficiently corrected." *Pulliam v. Tallapoosa County Jail*, 185 F.3d 1182, 1188 (11th Cir.1999). *Accord Bear Valley Church of Christ v. De-Bose*, 928 P.2d 1315 (Colo.1996).

> Few jury charges in cases of complexity will not yield 'error' if pored over, long after the fact in the quiet of the library – if such an enterprise is to be allowed. It is not. . . . [Instructional plain error] rules vindicate powerful interests in orderliness and finality. They also reflect the central role of the [trial] Court. It is not a way station or entry gate. Rather, trials are the heart of the system. Trial, not appeal, is the main event.

*Highlands Insurance Co. v. National Union Fire Insurance Co.*, 27 F.3d 1027, 1032 (5th Cir.1994).

■ Consequently, only "in rare instances," *Scheer v. Cromwell*, 158 Colo. 427, 429, 407 P.2d 344, 345 (1965), involving "unusual," *Bohlender v. Oster, supra,* 165 Colo. at 168, 439 P.2d at 1001, or "special," *Warner v. Barnard,* 134 Colo. 337, 341, 304 P.2d 898, 900 (1956), circumstances, will an appellate court exercise its discretion to review waived instructional error in civil cases for plain error. Even then, an appellate court will reverse the outcome of trial only when necessary to avert unequivocal and manifest injustice. *Blueflame Gas, Inc. v. Van Hoose, supra.* See *Farley v. Nationwide Mutual Insurance Co.,* 197 F.3d 1322 (11th Cir.1999)(articulating standard in terms of a "miscarriage of justice").

■ To meet this stringent standard, a party must at least demonstrate that the error "almost surely affected the outcome of the case." *See Champagne v. United States,* 40 F.3d 946, 947 (8th Cir.1994)(trial court's failure to assess evidence under appropriate legal standard); *Angelo v. Armstrong World Industries, Inc.,* 11 F.3d 957, 961 (10th Cir.1993)(trial court's exclusion of evidence).

■ Here, after reviewing the evidence and arguments presented at trial as well as the other instructions given to the jury, it is not at all clear to us that a different verdict would have been returned had the jury been instructed as the City now desires. Consequently, we conclude there is no plain error warranting a new trial. *Cf. Pulliam v. Tallapoosa County Jail, supra* (court's failure to explain that defendant had burden of proof on mixed-motives issue in racial discrimination employment case, not plain error).

### IV. Attorney Fees

■ Because we affirm the judgment for the plaintiff, we necessarily reject the City's request to reverse the award of attorney fees and costs to the plaintiff as the prevailing party here. *See Langseth v. County of Elbert,* 916 P.2d 655 (Colo.App.1996) (prevailing plaintiff in civil rights action entitled to attorney fees and costs).

### V. Dismissal of § 1981 Claim

In his cross-appeal, the plaintiff contends that the trial court erred in directing a verdict against him on his § 1981 racially hostile work environment claim. In light of our previous rulings, we need not address this issue.

Under 42 U.S.C. § 1981a(a)(1) (1999), a plaintiff may recover damages under Title VII only if he or she "cannot recover" damages under § 1981. Section 1981a(a)(1) "prevents a double recovery of damages by a plaintiff bringing claims under Title VII and § 1981." *Harrington v. American National Red Cross St. Louis Bi–State Chapter,* 31 F.Supp.2d 703, 706 (E.D.Mo.1999)(n. 5). *See also Daneshvar v. Graphic Technology, Inc.,* 40 F.Supp.2d 1225 (D.Kan.1998)(n.10)(court would not award damages under both title VII and § 1981); *Dunning v. General Electric Co.,* 892 F.Supp. 1424 (M.D.Ala. 1995)(1991 congressional amendments to civil rights laws permitted plaintiffs to recover damages – but not duplicative damages— under Title VII).

[23] Here, rightly or wrongly, the trial court's ruling precluded plaintiff from recovering damages on his § 1981 claim. He did, however, recover damages on his Title VII claim, and we have not disturbed the basis for that award on appeal. Because plaintiff is not entitled to any additional recovery, we decline to address the propriety of the trial court's order dismissing his § 1981 claim.

Accordingly, the judgment is affirmed.

Judge PLANK concurs.

Judge DAVIDSON specially concurs.

Judge DAVIDSON specially concurring.

Most civil litigation is outrageously costly. And, if an appellate court finds instructional "plain error," the usual remedy is a new trial. Thus, the paradoxical result of "doing equity" in such cases is that the non-erring party bears the expensive burden of his or her opponent's errors. In my view, if an instructional error is such that it would constitute a miscarriage of justice sufficiently egregious to constitute plain error, then the more appropriate remedy is a legal malpractice action. The inevitable damage award to the erring attorney's client would place the financial burden and responsibility for a mistake of that magnitude where it belongs.

Accordingly, although I recognize that decisional law thus far appears to leave the door open for the "rare [civil case] where equitable concerns might warrant appellate review despite the lack of a contemporaneous objection to the jury instructions," *see Bear Valley Church of Christ v. DeBose*, 928 P.2d 1315, 1331 (Colo.1996), were I writing on the proverbial clean slate, I would follow the reasoning of the Seventh and Ninth Circuits, and read C.R.C.P. 51 literally and refuse to recognize any exception to its terms. *See Deppe v. Tripp*, 863 F.2d 1356 (7th Cir.1988); *Hammer v. Gross*, 932 F.2d 842 (9th Cir. 1991) (discussing federal rule).

Accordingly, although otherwise I agree completely with the majority opinion, I write separately here to set out the different reasoning I would follow to reach the majority's result in Part III.