EMPLOYMENT TELEVISION ENTER-PRISES, LLC, d/b/a Digital Media Classifieds; Evan A. Neubeiser; and Etienne B. Neubeiser, Plaintiffs and Third–Party Defendants–Appellees and Cross–Appellants,

v.

Jon J. BAROCAS; Employment Television, Inc.; Employment Television of California, Inc.; and Employment Television of New England, Inc., Defendants and Third–Party Plaintiffs–Appellants and Cross–Appellees.

No. 02CA0216.

Colorado Court of Appeals, Div. IV.

Aug. 12, 2004.

Morrison & Foerster, LLC, Tarek F.M. Saad, Lila M. Bateman, Denver, Colorado, for Plaintiffs and Third–Party Defendants–Appellees and Cross–Appellants.

Yates and Leal, LLP, Carlos Leal, Denver, Colorado, for Defendants and Third–Party Plaintiffs–Appellants and Cross–Appellees.

Opinion by Chief Judge DAVIDSON.

In this action involving a purchase and licensing agreement, defendants, Jon J. Barocas; Employment Television, Inc.; Employment Television of California, Inc.; and Employment Television of New England, Inc. (collectively, ETV), and plaintiffs, Employment Television Enterprises, LLC, d/b/a Digital Media Classifieds; Evan A. Neubeiser, and Etienne B. Neubeiser (collectively, DMC), appeal and cross-appeal, respectively, the judgments of the trial court entered after a bench and a jury trial. We affirm in part, reverse in part, and remand for further proceedings.

In 1997, the parties entered into a business partnership for purposes of jointly developing and providing television programs based on newspaper classified ads. In 1999, the parties ended their partnership and entered into a sale and purchase agreement, which provided for the sale of ETV's partnership interest to DMC and also outlined a framework for the parties' future relationship. Additionally, the parties contemporaneously entered into a license agreement governing the use of certain trademarks by the parties.

Central to this litigation, the purchase agreement provided that, because of ETV's preexisting relationship with MediaNews Group, an owner of several newspapers throughout the United States, ETV "shall only operate in cities where MediaNews Group now or hereafter owns a controlling interest in a newspaper." However, DMC was permitted to operate in a MediaNews Group city if, upon providing notice to ETV of its intention to commence operations, ETV did not provide counternotice within 30 days of its intention to operate in that city and did not air "classified advertising programs for cable or broadcast television in that city" within 120 days after providing the counternotice.

DMC filed this case in 2000, alleging numerous claims against ETV, including that ETV breached the purchase agreement by operating in Boston and Sacramento and tortiously interfered with DMC's prospective business relationship in Sacramento. DMC also sought declaratory relief interpreting the purchase agreement regarding the rights to operate in Salt Lake City and Charleston, and rulings on whether ETV breached the agreement by misrepresenting the existence of a contract when the purchase agreement was executed and whether it was entitled to any prospective relief from this breach.

In response, ETV filed several counterclaims against DMC. As relevant here, ETV asserted that DMC breached the purchase agreement and tortiously interfered with it by operating in Sacramento. ETV also alleged a breach of the license agreement based upon the misuse of certain trademarks by DMC.

Prior to trial, upon DMC's motion, the court granted preliminary injunctive relief ordering a competitive freeze by both parties in the Boston market. During trial, the court entered directed verdicts on several of the claims, specifically ruling that (1) ETV breached the purchase agreement by operating in Boston; (2) DMC failed to establish damages in Boston; (3) ETV failed to prove any damages in Sacramento; and (4) alternatively, based on the court's interpretation of

"MediaNews Group city" in the purchase agreement, DMC did not breach the purchase agreement by operating in Sacramento.

Ultimately, the jury found that ETV breached the purchase agreement and tortiously interfered with DMC in Sacramento and awarded damages in the amount of $315,750 for both of these claims. The jury also found in favor of ETV on its claim of breach of the license agreement, but awarded only nominal damages.

In addition, the trial court granted declaratory relief, concluding that (1) ETV breached the purchase agreement by misrepresenting the existence of a contract in Oakland, but DMC was not entitled to any relief; and (2) ETV was entitled to operate in Salt Lake City and Charleston because these cities were MediaNews Group cities. The trial court also granted a permanent injunction in favor of DMC prohibiting ETV from operating in Boston based upon ETV's breach of the purchase agreement in Boston, and it awarded attorney fees and costs in favor of DMC under a prevailing party provision in the agreement.

## I. Boston

The trial court determined that ETV had breached the purchase agreement by airing a program in Boston because the 120–day period had expired and, consequently, DMC had acquired exclusive rights to operate there.

ETV contends that this determination was error because it had aired a program prior to the 120–day deadline imposed by the agreement. In the alternative, ETV contends that the permanent injunction from operating in the Boston area was improper.

In response, DMC argues that the court properly determined that ETV breached the agreement and correctly enjoined ETV from operating in the Boston area, but that the court's directed verdict on its damages claim was erroneous.

We conclude that the trial court correctly determined that a breach occurred, that the injunction should be imposed, and that damages should not be awarded. However, we remand for further proceedings on the scope of the injunctive relief.

### A. Breach of Purchase Agreement by ETV

■ Pursuant to the terms of the purchase agreement, upon DMC's notice to ETV to commence operations in Boston, ETV provided counternotice on January 21, 2000, of its intention to occupy the Boston market. On May 12, 2000, ETV began airing promotional spots for the employment program. On May 22, 2000, 122 days after providing counternotice to DMC, ETV began airing an employment television show in Boston.

In the trial court, ETV argued that it had aired a "program" within the 120–day deadline because television promotions are included within the television industry's definition of program. However, the trial court determined that the term "program" in the agreement referred to the airing of a finished television product because the "plain meaning and general usage of the word" did not encompass promotional spots.

In the appropriate context, a "program" usually refers to "a scheduled radio or television show." *The American Heritage Dictionary of the English Language* 1401 (4th ed.2000).

■ ETV contends that, regardless whether "program" is generally a plain and unambiguous term, the trial court erred by not fully considering proffered evidence of usage of trade within the television industry to more broadly define the term. We agree that a court should initially consider any evidence of trade usage when interpreting an agreement, but conclude that any failure to do so here was harmless.

■ Even if a term is not facially ambiguous, evidence of industry standards may be used to demonstrate the parties' intent. *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789 (Colo.App.2001); *see also* § 4–2–202 cmt. 1(c), C.R.S.2003 (rejecting "[t]he requirement that a condition precedent to the admissibility of [trade usage] is an original determination by the court that the language used is ambiguous"); Restatement (Second) of Contracts § 222 cmt. b ("There is no

requirement that an agreement be ambiguous before evidence of a usage of trade can be shown."); *Farnsworth on Contracts* § 7.12, at 319 (3d ed. 2004)("[I]n determining whether contract language is ambiguous, a court is not limited to the face of the contract itself. It may look at . . . any relevant usage of trade."); *Corbin on Contracts* § 24.13, at 109–23 (rev. ed.1993).

■ In deciding whether usage of trade evidence makes a term ambiguous, a court should first consider any evidence of trade usage that proposes an alternative definition. Thus, trade usage evidence is admissible even if the language is plain and unambiguous on its face, as long as the evidence is sufficient to suggest an alternative meaning. *See Cheyenne Mountain Sch. Dist. No. 12 v. Thompson,* 861 P.2d 711 (Colo.1993); *cf. Lazy Dog Ranch v. Telluray Ranch Corp.,* 965 P.2d 1229, 1236 (Colo.1998).

ETV's offer of proof, contained in its industry expert's report, was that ETV was "on air" in Boston prior to the 120–day deadline because promotional spots for the show appeared prior to May 22, 2000. The record reflects that the trial court reviewed this proffer, but concluded the "plain meaning and general usage" of the term to be paramount. We cannot ascertain from this ruling whether the trial court properly considered ETV's trade usage evidence but found it insufficient to establish ambiguity in light of the plain meaning, or whether the court considered the evidence to be irrelevant in light of the plain and unambiguous nature of the term.

Nevertheless, in reviewing ETV's proffer, we conclude that it was inadequate to establish any ambiguity in the term. Significantly absent was any assertion that airing a "program"—as was required under the agreement—was equivalent to being "on air." More important, the report did not assert that the term "program," as used in the industry, referred to anything other than a television show. Any error by the trial court in failing to properly consider the trade usage evidence is, therefore, of no consequence, and the trial court correctly determined that ETV breached the purchase agreement by airing a program in Boston after the time permitted under the agreement.

## B. Remedy

Because the court properly determined that ETV breached the agreement by airing a program in Boston after the applicable deadline, we next consider the parties' arguments regarding the appropriate remedy. We conclude that the trial court's determination as to DMC's damages and the issuance of a permanent injunction was correct, but we remand for further consideration of the permanent injunction.

### 1. Damages

■ At trial, the parties agreed that the measure of damages would be DMC's lost profits. However, the court directed a verdict on DMC's damages claim because it had failed to sufficiently establish the existence of damage in Boston, and consequently, excluded DMC's damages expert. On appeal, DMC contends that the court erred in its directed verdict and its subsequent refusal to permit the expert to testify. We disagree.

■ Under certain circumstances, the existence of lost profits from an "anticipated business venture" may be too uncertain as a matter of law. *See Roberts v. Holland & Hart,* 857 P.2d 492, 497 (Colo.App.1993)("To support a claim for damages based on lost profits, a plaintiff must establish the fact of damages. . . ."). In making this determination, the fundamental question is whether the business venture was a likely possibility, supported by repeated actions indicating the probable consummation of a transaction, or whether the venture was closer to a mere anticipated opportunity. Specifically, a court may look to such factors as the state of the negotiations or the party's history within the particular business. *See Cope v. Vermeer Sales & Serv. of Colo., Inc.,* 650 P.2d 1307, 1309 (Colo.App.1982); *see also W. Cities Broad., Inc. v. Schueller,* 849 P.2d 44, 50 (Colo.1993)(In determining whether existence of damage has been established, damages must be "reasonably certain by competent proof," and one factor is whether the business opportunity was "real, tangible and one which was founded on the actual activities or

past experience of the plaintiff's particular business.").

Here, DMC had contacted the Boston Globe by telephone, at a conference, and by letter. Based on these contacts, DMC was prepared to recommend a sixty-minute television program to the Boston Globe. However, at best, this evidence shows only that DMC had contemplated entering into a contract with the Boston Globe in the future and that the Boston Globe had expressed an "interest" in entering into a contract. Consequently, this evidence does not ineluctably lead to the conclusion that a contract between DMC and the Boston Globe was likely. While there was evidence that DMC had previous success in entering into these types of contracts, the trial court did not err in determining that the evidence was closer to an anticipated opportunity, rather than a likely possibility.

Thus, the trial court correctly concluded that DMC had failed to establish the existence of damage in Boston with the required certainty. As a result, it did not abuse its discretion in excluding DMC's expert's testimony regarding damages in Boston and properly directed a verdict in favor of ETV as a matter of law.

## 2. Permanent Injunction

■ ETV contends that the trial court's entry of an injunction permanently prohibiting it from operating in Boston was error. Specifically, ETV contends that the trial court's determination was not supported by the evidence, the trial court should have conducted an evidentiary hearing, and in any event, the injunction was overbroad. We conclude that entry of the injunction was proper, but remand to the trial court to reconsider its scope.

■ Generally, a party seeking a permanent injunction must show that (1) the party has achieved actual success on the merits; (2) irreparable harm will result unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause to the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Langlois v. Bd. of Coun-*

*ty Comm'rs*, 78 P.3d 1154 (Colo.App.2003); *see also Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175 (10th Cir.2003).

ETV contends that there was no evidence that irreparable injury would result from the failure to grant the permanent injunction, that the threatened injury outweighed the harm caused to the opposing party, and that the injunction would not adversely affect the public interest. We disagree.

■ A permanent injunction is the typical means to enforce a reasonable noncompetition provision of a contract. *Ditus v. Beahm*, 123 Colo. 550, 551, 232 P.2d 184, 185 (1951)(If "there is a valid covenant not to compete, a breach is regarded as the controlling factor and injunctive relief follows almost as a matter of course."). Because of the nature of a covenant not to compete, the requirements for a permanent injunction are presumed. *See Harrison v. Albright*, 40 Colo.App. 227, 577 P.2d 302 (1977); *Flower Haven, Inc. v. Palmer*, 502 P.2d 424 (Colo. App.1972)(not published pursuant to C.A.R. 35(f)). Although ETV contends that the contract here is "not a typical covenant not to compete," nonetheless, it determines which party may occupy a given market. By preventing the other party from operating in that market, it functions much like an agreement not to compete, and, thus, we conclude that an injunction was a proper remedy.

■ Additionally, because, in this context, the purpose of an injunction is to prevent the occurrence of future harm and not to penalize a defendant for a past breach, we are not persuaded by ETV's contention that DMC's failure to establish damages precluded an award of injunctive relief. *See Atmel Corp. v. Vitesse Semiconductor Corp., supra*, 30 P.3d at 796.

We further conclude, contrary to ETV's argument, that no separate hearing was necessary because the court's ultimate determination was made with record support. *See City of Colorado Springs v. Blanche*, 761 P.2d 212 (Colo.1988).

ETV asserts that because the injunction forbids it from ever reentering the Boston market, it is too broad. To the extent the agreement appears to permit ETV to operate

in a city not occupied by DMC if a newspaper located in that city subsequently is purchased by MediaNews Group, we agree. Consequently, on remand, the trial court should reconsider the scope of the injunction in light of the terms of the purchase agreement. *See Bullock v. Cayot,* 501 P.2d 147 (Colo.App.1972)(not published pursuant to C.A.R. 35(f))(injunctive relief must conform to the terms provided for in the contract).

## II. Sacramento

In June 2000, ETV contemplated expanding its operations into Sacramento through an arrangement with a MediaNews Group newspaper located in Woodland, California, approximately twenty miles from Sacramento. However, at that time, DMC had already made arrangements with the Sacramento Bee newspaper to air its employment television product in Sacramento during July. Upon learning of DMC's presence in Sacramento, ETV informed DMC to cease operating there. Because of the presence of a MediaNews Group newspaper in the Sacramento television market, ETV considered Sacramento a MediaNews Group city under the purchase agreement and, as a result, asserted the initial right to operate in that market. At the same time, ETV threatened DMC with litigation based on its interpretation of the purchase agreement. The Sacramento Bee did not want to begin the television program under these threats of litigation, and as a result, DMC abandoned its efforts.

At trial, the court determined that, because pursuant to the purchase agreement ETV could only operate in cities in which MediaNews Group owned a newspaper, ETV did not have the right to operate in Sacramento. Based on this ruling, the jury ultimately determined that ETV had breached the agreement by operating in Sacramento. The jury also found that ETV tortiously interfered with DMC's prospective business relationship with the Sacramento Bee through improper threats of litigation.

ETV contends that the evidence does not support DMC's claim for tortious interference. ETV also contends that the trial court erred in determining as a matter of law that it had breached the agreement by operating in Sacramento. Finally, ETV contends the court's determinations as to Sacramento establish that its similar, but inconsistent determinations regarding Boston were erroneous. We conclude that no errors occurred.

### A. Liability for Tortious Interference by ETV

■ ETV contends that the evidence was insufficient to support the jury's verdict on DMC's claim of tortious interference. Specifically, ETV contends that there was no evidence to establish that it induced the Sacramento Bee not to enter into a contact with DMC or that its interference, if any, was improper. Furthermore, ETV argues DMC's withdrawal from Sacramento required entry of a directed verdict in their favor on this claim. We disagree.

■ To establish tortious interference with a prospective contractual relation, a plaintiff must show that the defendant intentionally and improperly interfered with the plaintiff's potential business relationship with a third party. *Amoco Oil Co. v. Ervin,* 908 P.2d 493 (Colo.1995).

■ First, contrary to ETV's assertions, DMC was not required to show that ETV induced the Sacramento Bee to abandon its business relationship with DMC. Tortious interference can result solely from actions directed toward the plaintiff intended to prevent that party from acquiring or continuing a prospective relation with a third party. *Amoco Oil v. Ervin, supra,* 908 P.2d at 500 (tortious interference may occur through either "(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing [the plaintiff] from acquiring or continuing the prospective relation" (emphasis added), quoting Restatement(Second) of Torts § 766B (1979)).

As to ETV's alternative argument that its actions did not constitute improper interference, the record reflects evidence that ETV's threats of litigation caused the Sacramento newspaper to abandon any effort to enter into an otherwise imminent contract with DMC. Although ETV points out that usually

the mere threat of litigation, without more, will not support a claim for tortious interference, the evidence here, when viewed in the light most favorable to the verdict, *see Robinson v. City & County of Denver*, 30 P.3d 677, 683 (Colo.App.2000)(sufficiency of evidence evaluated as a whole and in the light most favorable to the prevailing party), certainly permits a finding that the threats were improper. *See* Restatement (Second) of Torts § 767 cmt. c ("The use of these weapons of inducement is ordinarily wrongful if the actor has no belief in the merit of the litigation or if, though having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication."); *see also* Restatement (Second) of Torts § 768 (improper means prohibited by § 767 also prohibited between competitors).

Further, even if other evidence, such as DMC's withdrawal from Sacramento, may have suggested a different conclusion, we note that a directed verdict would have been improper because of the presence of conflicting evidence. *See Langlois v. Bd. of County Comm'rs, supra*, 78 P.3d at 1157 ("[D]irected verdict may be granted only where the evidence, considered in the light most favorable to the nonmoving party, compels the conclusion that reasonable people could not disagree and that no evidence, or legitimate inference from the evidence, has been presented upon which a jury verdict against the moving party could be sustained.").

### B. Damages for Tortious Interference by ETV

■ ETV contends that DMC's evidence of damages for lost profits in Sacramento was speculative and should have been excluded as a matter of law. Specifically, ETV contends that, because the court disallowed the testimony as to Boston, it should have also disallowed similar lost profit testimony as to Sacramento.

However, in comparing the testimony regarding negotiations in both markets and the assertions made in both experts' reports, we perceive material differences in DMC's likelihood of success in each city. Specifically,

DMC presented evidence that in Sacramento, unlike in Boston, it was less than one month away from airing a television program in cooperation with a newspaper in that city and that specific details of the business relationship were in place. Thus, the evidence supports the trial court's determination that DMC's claim for damages in Sacramento was not speculative.

### C. Tortious Interference by DMC

■ ETV contends that the trial court erred in failing to rule on its claim of tortious interference by DMC in Sacramento. However, an earlier ruling by the court, not challenged on appeal, directed a verdict against ETV on its breach claim on the ground that Sacramento was not a MediaNews Group city. This ruling also is dispositive of ETV's tortious interference claim.

Here, the purchase agreement provides, in relevant part, that ETV "shall only operate in cities where MediaNews Group now or hereafter owns a controlling interest in a newspaper."

■ A contract should be construed according to the plain and generally accepted meaning of the words used. Furthermore, the mere fact that the parties have different interpretations of the language does not automatically create an ambiguity. *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo.1990).

Although ETV contends that this provision could be interpreted to include cities within a particular demographic market area, the trial court properly determined that a plain reading clearly provides that ETV shall operate only in cities, not markets, where MediaNews Group owns a newspaper.

Thus, because MediaNews Group owned a newspaper in Woodland, but not in Sacramento during the relevant period, ETV was not permitted to operate in the latter city, and consequently, ETV had no claim for tortious interference against DMC.

### D. Implication of Trial Court's Determination—Sacramento vis-a-vis Boston

As discussed, by the plain language of the agreement, Sacramento was not a Me-

diaNews Group city because there was no MediaNews Group newspaper there. On appeal, ETV appears to argue that, nevertheless, this ruling is inconsistent with the trial court's earlier rulings regarding Boston. Specifically, ETV asserts that the court's finding of breach based upon ETV's association with a MediaNews Group newspaper in Lowell, a city located approximately thirty miles from Boston, implies that Boston was a MediaNews Group city.

However, it does not appear that ETV made any such assertions in the trial court. Indeed, the record indicates that in the context of ETV's breach of the purchase agreement in Boston, this issue was neither framed in this manner at trial nor raised at any time for the trial court's consideration.

In any event, even assuming such an inconsistency, the result here would not change. Simply stated, if Boston was not a MediaNews Group city, then by the undisputed facts, ETV was still in breach in Boston because it aired a program in a non-MediaNews Group city, which is not permitted under the agreement.

## III.   Declaratory Judgment

Because of the prospective nature of the purchase agreement, the parties also sought a declaratory judgment regarding their rights to operate in Salt Lake City and Charleston. DMC also sought a declaration that ETV was in breach of the agreement by asserting that it had a contract in place with a news organization in Oakland when the purchase agreement was executed. The trial court determined that Salt Lake City and Charleston were MediaNews Group cities under the agreement and that ETV breached the agreement by representing the existence of a contract in Oakland. We find no error in this judgment.

### A.   Salt Lake City and Charleston

■■■■■  DMC contends that the trial court erred by considering Salt Lake City and Charleston as MediaNews Group cities. As previously discussed, the purchase agreement provided that ETV shall operate only in a city where "MediaNews Group now or hereafter owns a controlling interest in a newspaper."

DMC argues that because the newspapers in Salt Lake City and Charleston are each partially owned by an entity merging certain business and production functions of the newspaper's operations with a local competitor, and MediaNews Group only owned fifty percent of these entities, it did not own a controlling interest in these papers.

Relying upon the portions of the agreement defining control as the "ability to direct or cause the direction of management or policies," the trial court concluded that because MediaNews Group had full control over the editorial and news reporting functions of the Salt Lake Tribune and the Charleston Daily Mail, it had a controlling interest in those newspapers.

While we disagree with the trial court's reasoning, we nonetheless affirm its determination. *See Sohocki v. Colo. Air Quality Control Comm'n,* 12 P.3d 274 (Colo.App.1999)(correct judgment may be affirmed on reasoning different from trial court's). Unlike the trial court, we are not persuaded that the parties intended that definition of "control" to apply to the provision dictating where ETV could operate. Specifically, the purchase agreement does not indicate that ETV shall operate where MediaNews Group *manages* a controlling interest in a newspaper, but rather where MediaNews Group *owns* a controlling interest in a newspaper. Thus, we read the plain language of the agreement to require that MediaNews Group have actual financial ownership of a controlling interest in the newspaper, not merely managerial control.

To own a controlling interest, MediaNews Group must own more than fifty percent of a particular newspaper. *See Black's Law Dictionary* 816 (8th ed. 2004)(A controlling interest is "a greater–than–50% ownership interest in an enterprise."); *see also Am. Cas. Co. v. Etowah Bank,* 288 F.3d 1282, 1286 (11th Cir.2002)(acquiring a controlling interest in a business is "buying more than 50% of its shares").

Here, MediaNews Group held a fifty percent interest in the applicable joint entities in

both Charleston and Salt Lake City. However, the joint entities did not control all functions and own all assets of the respective newspapers. Instead, the record indicates that, at a minimum, the news and editorial functions were retained by the individual newspapers and, consequently, not transferred to the joint entities. By retaining these functions, the individual newspapers owned assets distinct from the joint entities. Thus, when combined with the fifty percent ownership of the assets transferred to the joint entity, MediaNews Group owned, at a minimum, an amount greater than fifty percent of the Salt Lake Tribune and the Charleston Daily Mail. As a result, Salt Lake City and Charleston were MediaNews Group cities.

### B. Oakland

■ DMC sought a declaration that ETV had misrepresented the existence of a contract in Oakland when the purchase agreement was executed, and a corresponding order prohibiting ETV from operating in this market. The trial court agreed with DMC as to ETV's breach, but declined to order any future relief regarding the rights of the parties.

ETV asserts that the portion of the declaratory judgment determining that it was in breach of contract was in error. Specifically, it contends that there was evidence that a contract existed between it and the Alameda News Group before the purchase agreement was executed. We disagree.

In the purchase agreement, executed on August 19, 1999, ETV represented that it was under contract with the Alameda News Group. However, the evidence at trial included a draft contract between those parties that, at the very earliest, was not completed until four days after the purchase agreement was executed. This document indicated that ETV and Alameda News Group were engaged in ongoing communications regarding essential terms to an agreement as of August 23, 1999. While ETV argues on appeal that this draft contract was inadmissible hearsay, the record indicates that it was admitted without objection by ETV at trial. *See Estate of Stevenson v. Hollywood Bar & Cafe,*

*Inc.,* 832 P.2d 718 (Colo.1992)(issues may not be raised for the first time on appeal).

Thus, we conclude that the trial court did not err in determining that ETV breached the agreement. We note, however, that the trial court found no damages or remedy for this breach, and DMC does not contest this finding on appeal.

### IV. License Agreement

The parties contemporaneously entered into a license agreement to regulate DMC's use of ETV's trademarks. Specifically, as relevant here, the agreement permitted DMC to use "Employment Television, Employment TeleVision, and Employment Tele-Vision, ETV" in "any form design size medium or print style." The agreement also provided for measures of quality control by ETV over DMC's use of these trademarks. Based on this provision, the trial court ruled that the use of the term "Employment TV" was not permitted under the license agreement.

ETV relied upon the alleged use of "Employment TV" and the failure to abide by a quality control provision in the license agreement as the grounds for its claim of breach. Based on these acts, the jury determined that DMC had breached the license agreement, but also found that any damages were nominal. We conclude that neither of the actions on which the jury relied is sufficient to constitute a breach of the agreement. Therefore, the jury's verdict regarding this breach must be set aside.

### A. Use of "Employment TV"

■ DMC first contends that the trial court erred in determining that its use of "Employment TV" could constitute a breach of the license agreement. We agree because, as a matter of law, the marks "Employment Television" and "Employment TV" are so similar as to preclude confusion by the public.

■ As part of the license agreement, ETV and DMC have the implied duty to maintain the value and validity of the trademarks. *See Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.,* 967 F.2d 1516, 1519 (11th

Cir.1992); Restatement (Third) of Unfair Competition § 33, cmt. b (1995). As a consequence of this duty, the use of a registered trademark in a misleading way by a licensee may be considered a breach of a license agreement. *See Digital Equip. Corp. v. AltaVista Tech., Inc.*, 960 F.Supp. 456 (D.Mass. 1997)(use of trademark outside of permitted uses was a breach of license agreement); *see also Bunn–O–Matic Corp. v. Bunn Coffee Serv., Inc.*, 88 F.Supp.2d 914 (C.D.Ill. 2000)(use of similar existing, but not licensed, trademark misled public as to ownership of mark); 4 *McCarthy on Trademarks* § 25:30 (4th ed.1996).

■ ETV contends that the use of any mark different from the licensed mark constitutes a breach of this implied duty. However, the grant of a license to use a trademark is not so narrow as to preclude any variation in the use of the mark. Instead, the scope of the grant is limited to preventing a licensee from using the mark in a manner that misleads or confuses the public. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989)(the right created in a trademark, and therefore the right licensed to a licensee, is defined as a right of the public to be free from confusion); 4 *McCarthy, supra,* § 25:30 (misleading use occurs when a licensee goes beyond the rights granted to him by the license agreement); *see also James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 276 (7th Cir.1976)(Trademark laws exists not to protect trademarks, but to "protect the consuming public from confusion, concomitantly protecting the trademark owner's right to a non-confused public.").

Several factors have been used in trademark infringement cases to determine whether confusion is likely to occur from the use of a particular mark, such as the degree of similarity between the marks; the intent of the alleged infringer in adopting its mark; evidence of actual confusion; the relation in use and the manner of marketing between the goods or services marketed by the competing parties; the degree of care likely to be exercised by purchasers; and the strength or weakness of the marks. *See*

*First Sav. Bank v. First Bank Sys., Inc.*, 101 F.3d 645 (10th Cir.1996)(applying factors in trademark infringement context); Restatement (Third) of Unfair Competition §§ 20–23 (1995).

However, unlike an infringement action, in which the rights of an infringer using a mark similar to a trademark owned by another entity are evaluated, here we are examining the rights of a licensee to use a mark similar to the licensed trademark. Thus, we are not ascertaining whether the marks are so similar that they will cause confusion about who is represented by a product, but rather, whether the marks are so dissimilar as to cause sufficient confusion in the public to decrease the value of the mark. Accordingly, the weight accorded to some of the factors differs in this context.

Here, the central issue in assessing the potential for confusion is the similarity of the marks. *See Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir.1998)(quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780, 112 S.Ct. 2753, 2763, 120 L.Ed.2d 615 (1992): the key inquiry in a source confusion case is "whether the consumer is 'likely to be deceived or confused by the similarity of the marks' ").

■ The marks should be evaluated for similarity in sight, sound, and meaning. *See, e.g., First Sav. Bank, supra,* 101 F.3d at 653; *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir.1986). These factors are not considered in isolation, but instead are examined "in the context of the marks as a whole as they are encountered by consumers in the marketplace." *Beer Nuts, supra,* 805 F.2d at 925; *see* 3 *McCarthy, supra,* § 23:47 ("Conflicting marks consisting of both words and pictorial symbols must be compared in their *entireties* to determine likelihood of confusion." (emphasis in original)).

Here, because the marks "Employment Television" and "Employment TV" convey the same meaning, *see Webster's Third New International Dictionary* 2471 (4th ed. 1976)("TV" is a common abbreviation for "television"), we are persuaded that the marks are similar. *See King of Mountain*

*Sports, Inc. v. Chrysler Corp.,* 185 F.3d 1084, 1091 (10th Cir.1999)(marks were dissimilar because they did not "convey the same meaning or stimulate the same mental reaction"). We also note that the license did not limit the use of the mark to any particular style.

Furthermore, there is no evidence DMC intended to devalue the mark, and the evidence in the record supports the conclusion the services offered under the marks "Employment Television" and "Employment TV" were identical.

Thus, given the considerable similarities between "Employment Television" and "Employment TV," and our analysis of the other factors, we conclude as a matter of law that there is no likelihood of confusion here, and the trial court erred in determining that use of "Employment TV" could constitute a breach of the license agreement.

### B. Quality Control

■ DMC also challenges the jury's verdict that it breached the quality control provisions of the license agreement. We conclude that the verdict is unsupported by the evidence.

We must determine whether the evidence, viewed as a whole and in the light most favorable to the prevailing party, is sufficient to support the jury's verdict. If there is competent evidence to support a jury verdict, we will not disturb it. *Robinson v. City & County of Denver, supra,* 30 P.3d at 683.

Evidence was presented that DMC failed to provide rolling updates and advance copies of future use of the trademarks. However, based upon the plain language of the agreement, we conclude that this evidence was irrelevant to determining whether a breach occurred.

The agreement provided that to exercise quality control, ETV could request from DMC samples of all publicly distributed materials bearing the trademarks, and DMC was required to respond with a list of "marks which are then used." Thus, under the plain and unambiguous language of this provision, DMC was only required to submit all materials bearing the trademarks then currently used.

Here, the evidence at trial was that, upon notification from ETV, DMC provided information on the marks it was then currently using. The evidence, relied upon by ETV to establish this breach, that DMC failed to provide rolling updates and advance copies, was not relevant to a determination of a breach. As a result, there is no evidence in the record that DMC was in breach of this particular provision of the license agreement. Consequently, the jury verdict finding DMC in breach of the agreement must be set aside.

### V. Verdict Forms

■ One verdict form submitted to the jury combined both claims arising from ETV's actions in Sacramento. ETV contends that the use of a consolidated verdict form was error. We disagree.

■ Prejudicial error may exist where the record shows that a jury might have found differently if a different verdict form had been used. *Williams v. Chrysler Ins. Co.,* 928 P.2d 1375 (Colo.App.1996).

Here, the verdict form at issue provided for a consolidated finding on the claims of breach of contract in Sacramento and tortious interference in Sacramento and, consequently, for a single award. However, the record reflects that the jury was instructed on each claim separately. ETV has shown no prejudice to its substantial rights from the use of this combined verdict form, and, additionally, we find none.

### VI. Attorney Fees

The agreements provided for an award to the prevailing party of attorney fees it incurred in enforcement of the agreements. After trial, the court determined DMC was the prevailing party and awarded $185,000 in fees and costs.

On appeal, both parties challenge the trial court's award. While ETV contends that it was entitled to fees because it prevailed on its claim for breach of the license agreement, DMC asserts the trial court's award of fees was insufficient. We are not persuaded by either party's argument.

### A. Fees to ETV

■ ETV's contention that it was entitled to costs and fees as the prevailing party based on DMC's breach of the license agreement is moot because of our reversal of the jury's verdict on that claim. Furthermore, because DMC remains the prevailing party in this action, ETV is also not entitled to fees incurred on appeal.

### B. Fees to DMC

■ DMC contends that the trial court's award of fees was insufficient. We disagree.

■ A trial court has broad discretion in awarding attorney fees, and we will uphold this determination on appeal absent an abuse of this discretion. *Redmond v. Chains, Inc.*, 996 P.2d 759 (Colo.App.2000); *In re Marriage of Lishnevsky*, 981 P.2d 609 (Colo.App. 1999).

A review of the hearing on the reasonableness of attorney fees indicates that the trial court disallowed several items which it viewed as repetitive and certain billings which it considered excessive. In light of the trial court's ample discretion in this area, we find no basis in the record here to set aside the court's considered determination.

However, we agree with DMC that, pursuant to the applicable provisions of the agreements, it is entitled to its attorney fees on appeal.

The judgment regarding DMC's breach of the license agreement is reversed. The case is remanded to the trial court to reform the permanent injunction in accordance with this opinion and to determine the appropriate award of reasonable attorney fees for this appeal. In all other respects, the judgments are affirmed.

Judge VOGT and Judge LOEB concur.